# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

BJ'S WHOLESALE CLUB, INC.,

              Plaintiff,

    v.

KEURIG GREEN MOUNTAIN, INC.,

          Defendant.

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff BJ's Wholesale Club, Inc. ("Plaintiff" or "BJ's") brings this action for damages and permanent injunctive relief against Defendant Keurig Green Mountain, Inc. (formerly known as Green Mountain Coffee Roasters, Inc., ("GMCR") and successor to Keurig, Incorporated) ("Keurig" or "Defendant").  Plaintiff alleges, upon knowledge to itself and its own acts, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This is an action for damages and permanent injunctive relief against Defendant for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (as amended), and Sections 3, 4, and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15(a), and 26 (as amended).

2.      Keurig has abused and is continuing to abuse its market and monopoly power to prevent, delay, exclude, restrain, and/or suppress competition in the United States in the Single-Serve Brewer Market (defined below) and the Compatible Cup Market (defined below) to impose supra-competitive prices in the Compatible Cup Market. BJ's has paid those supra-competitive prices for K-Cups (defined below) purchased directly from Keurig.

3.      BJ's is a leading warehouse club operator on the East Coast of the United States.  Its clubs sell edible and non-edible grocery products, as well as general merchandise, gas and a variety of ancillary services.

4.      BJ's purchased K-Cups directly from Keurig.  Those K-Cups were then sold to BJ's customers. From September 7, 2010, through the present (the "relevant period"), BJ's purchased hundreds of millions of dollars' worth of K-Cups from Keurig, including those sold by Keurig to BJ's under BJ's private label Wellsley Farms.

5.      Keurig caused BJ's to be damaged in the form of overcharges. BJ's seeks redress for overcharge damages suffered by reason of Keurig's antitrust violations alleged herein.

6.      Overcharge damages are based on prices charged by Keurig and paid by BJ's. These damages are calculated by determining the difference between the price BJ's actually paid to Keurig for K-Cups and the price it would have paid, absent Keurig's unlawful conduct.

7.      Single-serve beverage brewers ("Single-Serve Brewers") are a type of electronic low-pressure brewer which runs hot water through a disposable, single-use portion pack containing coffee and/or, to a far lesser extent, other hot beverage components (like tea) ("Portion Packs") to make beverages in small quantities (i.e., one or two-serving cups).  Unlike traditional drip-coffee brewers, Single-Serve Brewers only make one cup-sized serving at a time in less than a minute. Consumers pay a significant premium for this: the price of traditional drip-coffee makers does not fully constrain prices for Single-Serve Brewers, demonstrating that Single-Serve Brewers are not reasonably interchangeable with traditional drip-coffee brewers.

8.      While Portion Packs come in many different forms, such as cartridges, disks, cups, or pods, a Portion Pack must be compatible with a particular Single-Serve Brewer.

9.      During the relevant period, Keurig controlled a market share between 80 and 90 percent of the Single-Serve Brewer market in the United States (the "Single-Serve Brewer Market"). The most popular Single-Serve Brewer is the Keurig Single-Serve K-Cup Brewer (the "K-Cup Brewer"). Portion Packs that are compatible with the K-Cup brewer include: (i) Portion Packs sold by Keurig under its brand name as well as those sold under its licensees' brand names ("K-Cups"); and (ii) Portion Packs manufactured, distributed, and sold by Keurig's competitors for use in Keurig

Single-Serve Brewers ("Competitor Cups") (together with K-Cups, "Compatible Cups"). Below is an illustration of a Keurig Coffee Brewer and K-Cup.

      

**Keurig Coffee Brewer**                    **K-Cup**

10.     Keurig is also the dominant manufacturer, distributor, and seller of Compatible Cups, and during the relevant period, controlled roughly 95% of the Compatible Cup market in the United States (the "Compatible Cup Market").

11.     Upon information and belief, Keurig makes the overwhelming majority of its profits and revenues in the Compatible Cup Market, and it analyzes this discrete market for competitive purposes. Upon information and belief, the revenues associated with sales of K-Cups are approximately four times those associated with sales of K-Cup Brewers. This is because Keurig sells its K-Cup Brewers at or below cost and sells its K-Cups at a very high profit. Keurig sells the brewers to create an installed base of customers. The customers, in order to use the K-Cup Brewer, must purchase Compatible Cups. The tighter the grip on Compatible Cup sales that Keurig has, the greater its supra-competitive profits.

12.     Keurig's market and monopoly power in the sale of Single-Serve Brewers and Compatible Cups is not the result of superior business acumen. Rather, as hereinafter alleged, it

results from an anticompetitive scheme to monopolize these markets and otherwise restrain trade and exclude competition.

13.     After being taken over by GMCR in 2006, Keurig devised and successfully implemented a multi-dimensional scheme to exclude competition and unlawfully exploit its monopoly even beyond September 2012—the date its key patents covering the technology for K-Cup filters expired. The multi-dimensional anticompetitive scheme includes, without limitation, Keurig's blocking of competing internet sales, anticompetitive acquisitions, prosecution of sham litigation, exclusive dealing arrangements at multiple levels across the supply and distribution chain, disparagement of competitor products, and the introduction of the 2.0 K-Cup Brewer, Keurig's next-generation Single-Serve Brewer that Keurig designed specifically for Competitor Cup incompatibility.

14.     **Blocking Internet Sales**. Immediately after the merger with GMCR, Keurig instituted measures designed to prevent online K-Cup sales through any entity other than Keurig.

15.     **Anticompetitive Acquisitions**. Keurig furthered its anticompetitive campaign by aggressively eliminating potential Compatible Cup competition through successive and increasingly expensive acquisitions of competitors: Tully's Coffee Corporation (2009), Timothy's Coffees of the World, Inc. (2009), Diedrich Coffee, Inc. (2010), and LNH Holdings, Inc. (Van Houtte) (2010). These companies were all licensees of Keurig's filter patents, and had the know-how and capacity to be strong competitors to Keurig in the Compatible Cup Market after Keurig' filter patents expired, leaving Keurig vulnerable to competition. By acquiring these companies, Keurig nipped this competitive threat in the bud.

16.     **Sham Litigation**. In 2010, non-infringing competitors, particularly competitors making and selling filter-less Compatible Cups, began to emerge. On October 1, 2010, just a few

5

weeks after filter-less, non-infringing Compatible Cups first hit the shelves, Keurig sued the leading Compatible Cup manufacturer, Sturm Foods, Inc. ("Sturm"), a subsidiary of TreeHouse Foods, Inc. ("TreeHouse"), alleging that Sturm's Compatible Cups infringed Keurig's patents directed at brewers and methods of using brewers. Keurig also alleged that Keurig's own consumers were infringing patents on the Keurig K-Cup Brewers by using Sturm's Compatible Cups, and that Sturm was liable for inducing infringement by Keurig consumers. Keurig instigated similar sham litigation against its other primary potential competitor, JBR, Inc. (d/b/a Rogers Family Company) ("Rogers"). Keurig's patent cases were objectively and subjectively baseless, and were eventually dismissed, but had their intended effect of suppressing actual and potential competition during the relevant period.

17.     **Exclusive Dealing Arrangements**. On information and belief, Keurig has entered into exclusionary arrangements with companies at multiple levels of the Compatible Cup supply and distribution chain. These arrangements operate to exclude and suppress actual and potential competition and have allowed Keurig to maintain its monopoly and monopoly pricing of K-Cups during the relevant period, including after expiration of Keurig's K-Cup patents. To maintain its Compatible Cup monopoly into the post-patent world, Keurig has continued to increase its network of exclusionary agreements to further impede the emergence of competition, and has substantially foreclosed competition by, among other actions, entering into unduly restrictive exclusive dealing arrangements with companies at multiple levels of the Compatible Cup supply and distribution chain—from sellers of machinery used to make Compatible Cups; to sellers of Compatible Cup components; to competitor coffee roasters and coffee brands whose coffee is used in Compatible Cups; and to the distributors and retailers who sell and market Compatible Cups to end-user consumers, businesses, and institutions. The terms and number of these anticompetitive agreements cannot be justified by any purportedly pro-competitive purpose.

18.     **Disparagement of Competitors**. As part of its anticompetitive scheme, Keurig also engaged in systematic dissemination of false, misleading, and disparaging statements in the marketplace with respect to Competitor Cups. Such disparagements included, without limitation, factually baseless claims regarding Competitor Cup quality and alleged adverse effects on Keurig Brewer operability.

19.     **Keurig 2.0**. To ensure a continuing monopoly, in 2015, Keurig launched a successor K-Cup brewing system (the "2.0 K-Cup Brewer"), which is embedded with technology intended to ensure that only K-Cups can be used with the 2.0 K-Cup Brewer. As prior generation K-Cup Brewers became obsolete, Keurig intended for the 2.0 K-Cup Brewer to lock customers into purchasing only K-Cups and lock-out competition from Competitor Cups. The announcement and introduction of the 2.0 K-Cup Brewer hindered competition by scaring off actual and potential manufacturers of Competitor Cups. Keurig also used its launch of the 2.0 K-Cup Brewer to force manufacturers and sellers of Competitor Cups to become Keurig licensees.

20.     As a direct and proximate result of Defendant's multi-dimensional anticompetitive scheme, BJ's has been deprived of a meaningful choice to purchase high-quality, less-expensive, and environmentally friendly Competitor Cups and forced to pay supra-competitive prices for K-Cups.

21.     As a measure and reflection of the success of Keurig's anticompetitive scheme, Keurig repeatedly raised the price of its K-Cups throughout the relevant period, including after Competitor Cups entered the market in 2010 and after its filter patents expired in 2012, and did not lose any appreciable market share as a result of any of these successive price increases. These price increases include, without limitation, a 10-15% increase in late 2010, multiple price increases in 2011, and Keurig's August 2014 announcement of another 9% price increase effective November

2014. These price increases, without the meaningful loss of market share, evidence Keurig's monopoly power.

22.     Plaintiff is threatened with future harm in the form of additional overcharges, within the meaning of Section 16 of the Clayton Act, if Keurig's continuing scheme to monopolize is allowed to continue unabated.

### THE PARTIES

23.     Plaintiff BJ's Wholesale Club, Inc. is a Delaware corporation with its principal place of business in Westborough, Massachusetts. During the relevant period, BJ's purchased hundreds of millions of dollars' worth of K-Cups directly from Keurig, including K-Cups sold by Keurig to BJ's under BJ's private label Wellsley Farms.  BJ's is a leading warehouse club operator on the East Coast of the United States. BJ's clubs sell edible and non-edible grocery products, as well as general merchandise, gas and a variety of ancillary services. From September 7, 2010 through the present, BJ's purchased hundreds of millions of dollars' worth of K-Cups at artificially inflated prices directly from Keurig.

24.     As a direct and proximate result of Defendant's anticompetitive conduct, Plaintiff paid supra-competitive prices for K-Cups, was injured as a result thereof, and will continue to sustain injury when making future purchases of K-Cups unless Defendant is enjoined from continuing such unlawful conduct.

25.     Defendant Keurig Green Mountain, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in Waterbury, Vermont. Until March 6, 2014, Keurig Green Mountain, Inc. was known as Green Mountain Coffee Roasters, Inc. (GMCR). Defendant Keurig Green Mountain, Inc. is a subsidiary of Keurig Dr Pepper Inc.

26.    Keurig, Incorporated was a corporation organized under the laws of the State of Delaware, with its principal place of business in Reading, Massachusetts. Keurig, Incorporated was a wholly-owned subsidiary of GMCR, now known as Keurig Green Mountain, Inc.

27.    Defendant Keurig Green Mountain, Inc. is the successor to Keurig, Incorporated which, prior to its merger with and into GMCR on December 31, 2013, was a wholly-owned subsidiary of GMCR organized under the laws of the State of Delaware with its principal place of business in Reading, Massachusetts. On March 10, 2014, GMCR and Keurig, Incorporated announced that they changed their names to Keurig Green Mountain, Inc.

28.    Upon information and belief, various persons and entities that are not named as defendants participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. These other entities have facilitated, adhered to, participated in, aided and abetted, and/or communicated with others regarding, inter alia, the alleged conspiracy to monopolize the Single-Serve Brewer and Compatible Cup Markets. Plaintiff reserves the right to name some or all of these entities as defendants at a later date.

29.    On information and belief, other corporations, partnerships, or business entities, currently unknown to Plaintiff, are co-conspirators with Keurig in its unlawful conduct.

## JURISDICTION AND VENUE

30.    This action arises, in part, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14; and under Section 4 of the Clayton Act, 15 U.S.C. § 15, to compensate Plaintiff for its damages, including treble damages. This Court has jurisdiction over Defendant pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22 and pursuant to 28 U.S.C. §§ 1331, 1337.

31.     This Court has personal jurisdiction over Defendant pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

32.     The Court has personal jurisdiction with respect to any entity which regularly does and solicits substantial business in this District with BJ's and others, either directly or through intermediaries, is continuously and systematically present in this District, and has established minimum contacts with this District. Here, Defendant is registered to do business in the State of New York, maintains a registered agent for service of process in New York, maintains a distribution center in New York, and banks with financial institutions in New York. Defendant is therefore at home in this District. Furthermore, Keurig, either directly or through the ownership and/or control of its subsidiaries, inter alia: (i) transacted business in this District; (ii) directly or indirectly sold or marketed substantial quantities of K-Cup Brewers and K-Cups in this District to BJ's and others; (iii) had substantial aggregate contacts in this District; and (iv) was engaged in an illegal, anticompetitive scheme to monopolize the Single-Serve Brewer Market and Compatible Cup Market, that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business in this District, including BJ's. Together, these substantial contacts with this District would not offend the traditional notions of fair play and substantial justice.

33.     Venue is also proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c) and (d) because Keurig can be found in and transacts substantial business in this District and a substantial part of the events or occurrences giving rise to the claims alleged occurred in this District.

## INTERSTATE COMMERCE

34.     Keurig manufactures, markets, and sells K-Cup Brewers and K-Cups in the United States in a continuous and uninterrupted flow of interstate commerce, including in this District.

35.     Keurig's business substantially affects interstate commerce in the United States, affects a substantial volume of trade and commerce in each state and territory of the United States, and has caused and continues to cause a substantial amount of economic harm and antitrust injury to the citizens of each state and territory of the United States.

36.     Upon information and belief, Keurig has manufacturing and distribution operations throughout the United States and sells and/or distributes K-Cup Brewers and K-Cups throughout the United States.

37.     Keurig stated in its 2013 SEC Form 10-K:

For fiscal 2013, approximately 92% of our consolidated net sales was attributed to the combination of portion packs and Keurig® Single cup brewers and related accessories. Fiscal 2013 net sales of $4,358.1 million were comprised of $3,187.3 million portion pack net sales, $827.6 million Keurig® Single Cup Brewer and accessories net sales and $343.2 million of other product net sales such as whole bean and ground coffee selections in bags, fractional packages, and cans, as well as cups, lids and ancillary items to our customers primarily in the U.S. and Canada.[1]

38.     Keurig stated in its 2015 SEC Form 10-K:

For fiscal 2015, approximately 95% of our consolidated net sales were attributed to the combination of hot system brewer pods and Keurig® hot system brewers and related accessories. Fiscal 2015 net sales of $4,520.0 million were comprised of $3,645.1 million pod net sales, $632.6 million Keurig® beverage system and accessories net sales and $242.3 million of other product net sales such as whole bean and ground coffee selections in bags, fractional packages, and cans, as well as cups, lids and ancillary items to our retail customers primarily in the U.S. and Canada.[2]

---

[1] GMCR 2013 Annual Report, http://investor.keuriggreenmountain.com/static-files/4da6b7f8-5b0d-48cb-b72a-55b06e85b047 ("GMCR 2013 10-K") at p. 9
[2] GMCR 2015 Annual Report, http://investor.keuriggreenmountain.com/static-files/d755b7a7-2a89-4030-b4f8-174d89b1aa86 ("GMCR 2015 10-K") at p. 6.

39.     Keurig's headquarters, executive offices, production, distribution, manufacturing, and research facilities are centralized in Vermont and large offices, manufacturing and distribution facilities are also located across the country.

40.     Keurig's activities, as alleged herein, were within the flow of, were intended to, and did have a substantial effect on United States interstate commerce.

41.     The unlawful anticompetitive conduct detailed herein impacted and harmed competition and purchasers in every state and territory of the United States. Keurig's anticompetitive conduct substantially affected trade and commerce and caused Plaintiff to pay supra-competitive prices for K-Cups.

## RELEVANT MARKETS

### I.     Relevant Product Markets

42.     There are two relevant product markets in which to evaluate Defendant's anticompetitive conduct: (1) the Single-Serve Brewer Market, and (2) the Compatible Cup Market. Keurig tracks market shares in the Compatible Cup Market to analyze its K-Cup market share for competitive purposes. In the alternative to the Compatible Cup Market, Keurig's anticompetitive conduct also affects the Portion Pack Market used in all Single-Serve Brewers more generally.

43.     In each of these Relevant Markets, Keurig maintains monopoly power evident by supra-competitive prices and market dominance.

#### A.     The Single-Serve Brewer Market

44.     The Single-Serve Brewer Market encompasses the design, manufacture, and sale of Single-Serve Brewers.

45.     Single-Serve Brewers are functionally distinct from other methods of making or procuring coffee and offer unique convenience, efficiency, and versatility that traditional drip coffee

makers and other brewing devices do not offer. Consequently, lower cost traditional drip coffee makers and other brewing devices do not meaningfully constrain prices for Single-Serve Brewers.

46.     Consumers do not consider other coffee brewing devices to be reasonably interchangeable with Single-Serve Brewers for the purposes for which Single-Serve Brewers are used. Single-Serve Brewers offer unique convenience and efficiency that traditional drip coffee makers do not, including that: (i) the coffee is prepared fresh in around or under one minute; (ii) the coffee does not sit in the pot and become bitter; (iii) there is no need for consumers to grind beans, measure coffee, use a separate filter, or clean up after brewing the beverage; and (iv) it allows multiple coffee drinkers in the same home or office not to agree on a particular flavor or even brand of coffee, and instead permits each person to choose based upon his/her tastes and preference.

47.     These distinguishing attributes are important to consumers. An early study by Keurig found that 88% of consumers preferred Single-Serve Brewers because of their convenience, quick-brewing, ease of use, and minimal clean up, and reported that these features were sources of "the most dissatisfaction with current home brewing systems."[3] Another study in 2012 reaffirmed consumers' convenience preference.[4] Finally, "a web-based survey of daily coffee drinkers found that the 'main differentiating factor [of Single-Serve Brewers from other brew methods] revolved around the speed of brewing a cup of coffee'" and that "'second highest importance was the convenience of no preparation or clean-up.'"[5] These studies show that purchasers do not consider other products to be reasonably interchangeable with Single-Serve Brewers for the purposes for which Single-Serve Brewers are used.

---

[3] *See* Cravens, David W. and Nigel F. Piercy, *Strategic Marketing*, at Case 6-7 (10th ed. McGraw Hill Irwin 2012).
[4] *See* "Coffee Drinkers Like Their Joe One Cup At A Time," *Mintel*, (Jan. 30, 2012) (reporting 79% of respondents preferred Single-Serve Brewers because of their convenience).
[5] *Id.* (citing Cravens, at Case 6-7).

48.     As a result of these significant and unique attributes, lower cost traditional drip coffee makers do not fully constrain prices for Single-Serve Brewers. In fact, Single-Serve Brewers do not exhibit strong, positive cross-elasticity of demand with respect to price as to traditional drip coffee makers. While traditional drip coffee makers are frequently sold around a price point of approximately $30 to $35, Single-Serve Brewers typically cost anywhere from $80 to several hundred dollars. Consumers are willing to pay a premium for Single-Serve Brewers over the price of traditional drip coffee makers.[6]

49.     Despite this significant price difference, the share of Single-Serve Brewers has risen unconstrained by the cheaper prices of traditional drip brewers. In 2013, Single-Serve Brewer sales revenue in the U.S. were approximately $900 million, with the Single-Serve Brewer Market growing at a rate of 7% per annum.[7] Meanwhile, the traditional-drip coffee brewer market has remained relatively stagnant. A small but significant, non-transitory price increase for Single Serve Brewers would not have caused a loss of sales to traditional drip coffee makers to make such a price increase unprofitable.

50.     The growth of the Single-Serve Brewer market continued after JAB Holding Company took Keurig private in 2016, with Keurig Single-Serve Brewers in 20% of U.S. households by January 2018, up from 17% U.S. household penetration two years prior.[8]

51.     Additionally, Single-Serve Brewers do not compete in the same market as prepared coffee purchased at a retail outlet such as coffee shops where beverages are prepared on the spot for

---

[6] *See, e.g.*, Declaration of Jon Rogers In Support of Plaintiffs' Motion For A Preliminary Injunction (1:14-md-02542-VSB-HBP, D.E. 86) ("Rogers Decl.") at ¶ 4.

[7] "Hot Beverages Appliance Drivers," The NPD Group (May 22, 2013 Press Release), http://www.npd.com/wps/portal/npd/us/news/press-releases/the-npd-group-reports-on-home-beverage-appliance-growth-drivers/.

[8] "Dr Pepper Snapple and Keurig Green Mountain to Merge, Creating a Challenger in the Beverage Industry with a World-Class Portfolio of Iconic Brands and an Unrivaled Nationwide Distribution Capability," Dr Pepper Snapple Group Financial News (Jan. 29, 2018), http://investor.drpeppersnapplegroup.com/financial-news?item=321

customers. The functionality of a single-serve drip maker is simply not replaceable by prepared coffee, because (among other distinguishing features), unlike the Single-Serve Brewers, buying prepared coffee at retail shops requires a person to leave their house or office and travel to a shop—each and every time they desire a coffee beverage.

52.     Available evidence bears this out. If Single-Serve Brewers and coffee shops were in the same market, shares of coffee consumed outside of the home should have plunged as the share of Single-Serve Brewers has escalated. They have not. Rather, the share of coffee consumed outside of the home has remained at around 20% over the last fifteen years, and in fact, increased after Keurig's introduction of the Single-Serve Brewer in 2004.[9] Single-Serve Brewers do not exhibit positive strong, cross-elasticity of demand with respect to price as to prepared coffee available from retail shops.

53.     Bart Becht, one of the partners of JAB Holding Company, the European private investment group that took Keurig private in 2016, has reaffirmed that coffee shops are a separate market, stating in an interview with the Wall Street Journal that "The fight is not with Starbucks,... The competitor... is Nestle."[10]

54.     Even if there were functional similarities between Single-Serve Brewers and traditional drip coffee brewers or prepared coffee from retail shops, they would be insufficient to permit inclusion of those products in the same relevant market with Single-Serve Brewers. To be an economic substitute for antitrust purposes, a functionally similar product must also exert sufficient

---

[9] *See* International Coffee Counsel, "Trends in Coffee Consumption in Selected Importing Countries," at p. VII-11 (Sept. 14, 2012), http://tinyurl.com/n26halr; International Coffee Council, "World Coffee Trade (1963-2013): A Review of the Markets, Challenges and Opportunities Facing the Sector," at p. 29 (Feb. 24, 2014), http://tinyurl.com/ojnvzqt; Daily Coffee News "Current Coffee Consumer Trends: Inside the NCA's 2018 Report," (March 21, 2018) https://dailycoffeenews.com/2018/03/21/current-coffee-consumer-trends-inside-the-ncas-2018-report/ ("79 percent of people drinking coffee within the past day brewed coffee at home, compared to 75 percent in 2017 and 84 percent in 2012").

[10] Zeke Turner and Julie Jargon, *The Secretive Company that Pours America's Coffee*, THE WALL STREET JOURNAL, (Mar. 7, 2018) https://www.wsj.com/articles/the-secretive-company-that-pours-americas-coffee-1520440633.

pressure on the prices and sales of another product, so the price of that product cannot be maintained at levels that would be maintained in a competitive market. But as alleged above, neither traditional drip coffee nor prepared coffee from retail stores have taken away sufficient sales from Single-Serve Brewers to constrain prices on Single-Serve Brewers, including those sold by Keurig.

### 1.  Keurig Single-Serve Brewers

55.     Keurig designs, manufactures, markets, and sells a variety of Single-Serve Brewers under the brand name Keurig®, including K-Cup® Brewers, Vue® Brewers, and Rivo® Brewers, each of which uses a different type of Portion Pack that is incompatible with other Single-Serve Brewers.[11]

56.     In addition to the Single-Serve Brewers manufactured by Keurig, upon information and belief, Keurig also licenses Single-Serve Brewer technology to Mr. Coffee®, Cuisinart®, and Breville®, among other brands.

57.     Keurig markets its Single-Serve Brewers for use in the "At-Home" or "Away-From-Home" segments (defined herein).

58.     These Single-Serve Brewers are sold for a range of prices. For example, the Keurig® K45 Elite Brewing System was priced at $119.99 in 2015, and the Keurig K-Elite Single Serve Coffee Maker sold for $149.99–$169.99 in 2018; the Mr. Coffee KG2 brewer for home use was priced at $89.95 in 2015, and the Mr. Coffee BVMC-SC100-2 Single-Serve Coffee Maker, Black With Silver Panel was priced at $59.99 in 2018; while the Breville brewer for home use had been priced at $249.95 in 2015.

59.     Apart from its K-Cup Brewers, Keurig also sold Vue Brewers that use a different type of Portion Pack, known as "Vue Packs," which are shaped differently than K-Cups. The Vue

---

[11] Vue Portion Packs were made compatible with the 2.0 K-Cup Brewer.

Brewer is not compatible with K-Cups, and Vue Packs cannot be used in pre-2.0 K-Cup Brewers. Keurig has discontinued its Vue Brewers.

60.     Keurig also offered the Rivo cappuccino and latte brewer, which was marketed for home use. This brewer "exclusively uses Rivo® Packs," which, again, are shaped differently than K-Cups and are not compatible with K-Cup Brewers. K-Cups, therefore, cannot be used in Rivo brewers. Keurig has discontinued its Rivo brewers.

61.     In Q1 2013, Vue Brewers and Vue Portion Packs accounted for less than 1% of Keurig's total net sales,[12] while Rivo, Keurig's single-serve espresso machine, addressed an even smaller segment of the market and therefore accounted for only a fraction of Keurig's sales.[13] The Keurig monopoly in the Single-Serve Brewer Market (discussed herein) is based almost entirely on its sale of its K-Cup brewers.

**2.  Single-Serve Brewers Manufactured By Other Companies**

62.     Additional Single-Serve Brewers aside from those manufactured by Keurig include Mars, Inc.'s "Flavia®," Bosch's "Tassimo®," Philips Electronics N.V's "Senseo®," Nestle's "Nespresso®," and Starbucks' "Verismo®."

63.     Keurig recognizes in its internal documents and agreements with third parties that Keurig primarily competes for brewer sales with the few other companies that also produce non-Keurig Single-Serve Brewers that brew a variety of hot beverages (such as tea, hot cocoa, cappuccinos, and other hot beverages, in addition to coffee) using a low-pressure brewing method, rather than other types of brewers that brew only coffee and/or espresso (which requires a high-pressure brewing method) using either a hopper to store coffee beans or a drip brewing system.

---

[12] *See* Seth Golden, "Green Mountain Coffee Roasters Q4 2013 Earnings Preview," Seeking Alpha (Nov. 18, 2013), https://seekingalpha.com/article/1846212-green-mountain-coffee-roasters-q4-2013-earnings-preview.
[13] *See* GMCR – Q2 Earnings Call. Tr. (Dated May 8, 2013) at p. 19.

64.    For example, in Keurig's agreements prohibiting competitor coffee roasters and brands from participating in "competing systems," Keurig explains that "competing systems" have the following characteristics: (1) "A brewing chamber designed to be pierced during the brewing process to allow hot water in and the brewed beverage out;" and (2) "A pressurized brewing process that takes place at pressures less than 30 psi inside the brewing chamber" ("Competitive Brewers").[14]

65.    Keurig's agreements further provide examples of brewers that Keurig admits are — and are not — "competing systems." Specifically, Keurig admits that:

> Examples of ... systems that would be competitive include single-cup portion-pack coffee systems such as those manufactured by Flavia, Kenco and Braun (the Tassimo system). **Examples of systems that would not be competitive are hopper-based single-cup coffee systems such as those manufactured by Filterfresh and Brio and espresso pod-based systems such as Illy pod espresso machines, Café Espresso and 123spresso systems**.[15]

66.    Prices across these Single-Serve Brewers can vary by as much as several hundred dollars. The majority of Single-Serve Brewers are priced at or above around $80. Keurig priced its 2.0 K-Cup Brewers even higher than the average Single-Serve Brewer, at $149.99 (for the K350 Brewer), $169.99 (for the K450 Brewer), and $199.99 (for the K550 Brewer).

67.    The market shares of these non-Keurig Single-Serve Brewers are fragmented and, collectively, represent a small share of the Single-Serve Brewer Market. Upon information and belief, in 2015, Keurig dominated this market, controlling at least 88% of the market.

### B.  The Compatible Cup Market

68.    The second relevant product market in which to evaluate Keurig's anticompetitive conduct is the market for the design, manufacture, and sale of Compatible Cups.

---

[14] *See* ECF No. 237-2 at 2, Exhibit B to Direct Purchaser's Second Amended Class Action Complaint, (attaching Am. And Restated Purchase and License Agreement by and among [Keurig] and Caribou Coffee Company, Inc., at § 5 (dated Dec. 20, 2011)) ("2011 Caribou Agreement")
[15] *See* 2011 Caribou Agreement § 5 (emphasis added).

69.     Keurig has itself acknowledged, in statements to the public and investors, that the Compatible Cup Market is distinct from the Portion Pack Market, discussed below, in that Compatible Cups do not face competition for use in K-Cup Brewers from Portion Packs that are incompatible with the K-Cup-format.

70.     Indeed, the Compatible Cup Market, as opposed to the broader Portion Pack Market, is the market in which Keurig tracks market share of K-Cups for competitive purposes.[16]

71.     The Compatible Cup Market is also distinct from the market for the sale of bagged coffee or other types of packaged beverages. As numerous articles have detailed, the price of coffee delivered by K-Cups is extremely high. The New York Times has noted that "Folgers [K-Cups], with 8 grams per capsule, work[] out to more than $50 a pound," which is "even more expensive than all but the priciest coffees sold by artisanal roasters, the stuff of coffee snobs."[17]

72.     The ability to increase K-Cup prices above their competitive levels has not been reasonably constrained by the price of ground coffee sold to consumers. Keurig itself has stated that its K-Cups cost 167% more per serving than bagged coffee.

73.     The price-per-pound of coffee contained in K-Cups and other Portion Packs is nearly five times greater than that of ground coffee. This has been the case because consumers who utilize Single-Serve Brewers and Compatible Cups generally find such packs to be substantially more convenient and desirable as compared with the brewed coffee from other formats. Thus, were K-Cups or other Portion Packs competitively priced, consumers who own a Single-Serve Brewer would generally not substitute away from its use in favor of other formats in reaction to a small but significant rise in the price for the corresponding Portion Packs.

---

[16] *See* GMCR, FQ1 2014 Earnings Call Tr. at 15 (Feb. 5, 2014).
[17] Oliver Strand, With Coffee, the Price of Individualism Can Be High, The New York Times (Feb. 7, 2012) https://www.nytimes.com/2012/02/08/dining/single-serve-coffee-brewers-make-convenience-costly.html.

74.     While the commodity price of coffee has a direct effect on the price of ground coffee, it does not have the same effect on the price of Compatible Cups, further demonstrating that Compatible Cups do not compete with ground coffee.

75.     Portion Packs in general have experienced dramatic growth despite the fact that they are far more expensive than traditional coffee. "[D]emand for GMCR's [Keurig's] K-Cups is still growing at a healthy 15% [year-over-year] clip."[18]

76.     For the owner of any given Single-Serve Brewer, the selection of Portion Packs is limited by brewer compatibility. The difference in Single-Serve Brewer designs means that Portion Packs developed for one type of Single-Serve Brewer will not typically work with another. For example, flat pod-style Portion Packs designed for use in the Senseo brewer and "T-Discs" designed for use in the Tassimo brewer will not work in a Keurig brewer.[19] Accordingly, Portion Packs designed for non-Keurig Single-Serve Brewers are not reasonably interchangeable with K-Cups for Keurig Single-Serve Brewers.

77.     Because the demand for Portion Packs is dependent upon the type of machine the buyer is using, Compatible Cups that can be used with a K-Cup brewer do not directly compete with Portion Packs that are not compatible with those Brewers.

78.     Upon information and belief, Keurig tracks market share in the Compatible Cup Market to analyze its K-Cup market share for competitive purposes.

79.     Companies that manufacture or sell Competitor Cups offer prices that are substantially lower than K-Cups and, hence, appeal to large numbers of price-conscious businesses and consumers.

---

[18] Northcoast Research. "GMCR Depp-Dive: $5.00 of EPS in FY 14 Not a Stretch." at p. 3 (Dec. 6, 2013).

[19] *See* Gabelli and Company, "The Global Coffee Industry – Growth (Still) Brewing," at pp. 7-8 (May 9, 2013).

80.     Competitor Cups are typically priced at least 15% to 25% less than the K-Cups produced or licensed by Keurig.[20] For example, Nielsen data collected from chain and independent grocery stores with annual sales exceeding $2 million for the 52-week period ending in July 2014, demonstrated that Keurig's K-Cups (excluding those marketed under Keurig's licensing agreements) are on average 16% more expensive than the Rogers' Competitor Cup, and that Keurig-licensed K-Cups and Portion Packs are priced even higher.

81.     Barriers to entry for the Compatible Cup Market are high and challenging for potential entrants. Potential entrants to the Compatible Cup Market cannot easily manufacture their own Single-Serve Brewers to accommodate their Competitor Cups because Keurig has a number of patents covering the technology in its Single-Serve Brewers.[21] Such a manufacturing effort would require successful research and development efforts, large commitments of sunk costs, and significant capital expenditures.

82.     Additionally, as discussed herein, potential entrants are further restrained from entering the Compatible Cup Market because Keurig has entered into exclusionary agreements with suppliers of the machinery and components used to make Compatible Cups. These agreements have restricted the ability of competitors to purchase machinery and inputs needed to compete with Keurig in the Compatible Cup Market.

83.     Small but significant non-transitory increases in the price of Compatible Cups do not significantly increase demand for T-Discs, pods, or other types of Portion Packs that are not compatible with a K-Cup Brewer. The reason for this is that most consumers of Compatible Cups

---

[20]*See*, *e.g.*, Green Mountain FQ12014 Earnings Call Tr. (Green Mountain admitting that Competitor Cups "came in at mostly 15 to 25% lower prices"), https://seekingalpha.com/article/1997961-green-mountain-coffee-roasters-ceo-discusses-f1q-2014-results-earnings-call-transcript.

[21] *See*, *e.g.*, *Keurig Green Mountain, Inc. v. Touch Coffee & Beverages, LLC*, Civil Action No. 1:16-cv-10142 D.E. 1 Complaint and Jury Demand at 1 (D. Mass. Feb. 1, 2016) (asserting Keurig's U.S. Patent Number 6,655,260 and noting Keurig's "numerous patents covering a wide range of innovations in the single-serve beverage space.").

own or otherwise utilize a K-Cup Brewer, and are sufficiently locked in to its use and find it impractical to substitute incompatible Portion Packs (as such substitution would necessarily require the added purchase of a non-K-Cup Brewer). The prices of T-Discs, pods, or other Portion Packs that are incompatible with K-Cup Brewers do not reasonably constrain the price of Compatible Cups. Consumers, therefore, do not consider incompatible Portion Packs to be reasonably interchangeable with Compatible Cups.

### 1.    The At-Home Market Segment

84.    The Compatible Cup Market includes at least two large market segments, including one covering Compatible Cups purchased by consumers for use at home in their K-Cup Brewers ("At-Home Market Segment"), and one covering Compatible Cups purchased for use outside the home (the "Away-From-Home Market Segment").

85.    The At-Home Market Segment is a multi-billion-dollar annual market. As of 2013, over 15 million U.S. households had a Keurig Single-Serve Brewer in the At-Home Market Segment.[22]

86.    Portion Packs are generally distributed to customers in the At-Home Market Segment through retailers, grocers, and online commerce.[23]

### 2.    The Away-From-Home Market Segment

87.    K-Cups are also consumed outside of consumers' homes at, among other places, convenience stores, food service, workplace, higher education, and hospitality locations.

88.    Upon information and belief, in 2015 the Away-From-Home Market Segment was a $600 million to $1 billion-dollar annual market.

---

[22] GMCR 2013 10-K at p. 2.
[23] Rogers Decl. at ¶ 11.

89.     Portion packs are distributed to consumers in the Away-From-Home market almost exclusively through office supply distributors and food-service management companies.[24]

90.     Keurig provides Single-Serve Brewers to "Office Coffee Services" customers (the Office Coffee Services Market Segment"), which is part of the Away-From-Home Market Segment.

91.     Upon information and belief, the Office Coffee Services Market Segment was estimated to account for $175 million to $250 million worth of Keurig's sales.

## C. The Portion Pack Market (in the alternative to the Compatible Cup Market)

92.     Instead of using Compatible Cups, some Single-Serve Brewers use Portion Packs that do not fit in K-Cup Brewers and have a different shape than Compatible Cups. For example, Hamilton Beach's Gevalia brewer and Philips Electronic N.V.'s Senseo brewer use a flat pod-style Portion Pack, and Bosch's Tassimo brewer utilizes a disc-like Portion Pack referred to as a T-Disc. Once a consumer purchases a K-Cup Brewer, that consumer generally cannot use other types of Portion Packs in the K-Cup Brewer. Thus, consumers do not view T-Discs or flat pod-style Portion Packs as reasonably interchangeable with Compatible Cups for use in K-Cup Brewers.

93.     Because Portion Packs that do not work in K-Cup Brewers are not reasonably interchangeable for the use of Compatible Cups in Single-Serve Brewers, the Compatible Cup Market is the appropriate relevant market in which to evaluate the harm caused by Keurig's unlawful and anticompetitive conduct to competition for the manufacturing, licensing, and sale of Portion Packs that compete with K-Cups, i.e., Competitor Cups.

94.     But even across a broader alternative market for the design, manufacture, and sale of all Portion Packs that are used in all Single-Serve Brewers, Keurig's unlawful and anticompetitive

---

[24] *Id.*

conduct harms competition because the K-Cup format is by far the most dominant Portion Pack format and Keurig controls the dominant share of Portion Packs, as well as Compatible Cups.

95.     Keurig possessed and exercised monopoly power over the Portion Pack Market.

96.     Keurig's share of the Portion Pack market has risen as a result of striking deals with many private label and unlicensed brands. While Keurig controlled approximately 73% of the Portion Pack Market in early 2014, Keurig's lucrative deals with major former competitors like Peet's Coffee and The Kraft Heinz Company has strengthened its share of the Compatible Cup Market and therefore, by implication, the Portion Pack Market as well.

97.     For the same reasons discussed above, the Portion Pack Market is a distinct economic market that is not constrained by other forms of hot beverages, such as those prepared from ground coffee, and Keurig has monopoly power over the Portion Pack Market.[25]

98.     Using its monopoly in the Single-Serve Brewer Market, Keurig is able to influence and control the Portion Packs Market.

99.     The same significant barriers to entry explained above with regard to the Compatible Cup Market are equally applicable to the Portion Packs Market, including large capital expenditures and significant technological and design skill and experience required for the mass production of Portion Packs.

**II.     Geographic Market**

100.     The relevant geographic market is the United States. Single-Serve Brewers, Compatible Cups, and Portion Packs are all sold throughout the United States. Much of the sales activity in the Single-Serve Brewer Market, Compatible Cup Market, and Portion Pack Market occurs through nationwide channels, including Keurig itself and nationwide retailers that maintain a

---

[25] *See supra* Relevant Markets, I(B).

strong online presence. National chain retailers that carry K-Cup Single-Serve Brewers, Compatible Cups, and Portion Packs include, without limitation, Walmart, Costco, Best Buy, Target, Staples, and Bed Bath & Beyond.

101.    To compete effectively within the United States, Compatible Cup manufacturers and sellers need distribution assets and relationships within the United States. Compatible Cup manufacturers and sellers located outside of the United States that lack such assets and relationships are unable to constrain the prices of Compatible Cup manufacturers and sellers that have such domestic assets and relationships.

## **MONOPOLY POWER**

102.    Keurig has improperly obtained and used its monopoly power to control the Single-Serve Brewer Market and the Compatible Cup (or in the alternative, the Portion Pack Market). Keurig has the power to control prices and exclude competition in both the Single-Serve Brewer Market and in the Compatible Cup Market (or in the alternative, Portion Pack Market), including the At-Home and Away-From-Home segments.

## **I.    Keurig Has Monopoly Power In The Single-Serve Brewer Market**

103.    Keurig dominates the Single-Serve Brewer Market, making it unlikely any new entrant could gain meaningful share.

104.    In November 2013, Keurig reported that, in fiscal year 2013 alone, Keurig sold approximately 10.6 million Single-Serve Brewers.[26] On a March 6, 2014 Shareholder's Conference

---

[26] Green Mountain Coffee Roasters Reports Full Fiscal year and Fourth Quarter Fiscal 2013 Results (Nov. 20, 2013 Press Release), http://investor.keuriggreenmountain.com/news-releases/news-release-details/green-mountain-coffee-roasters-reports-full-fiscal-year-and

Call, Keurig's President and CEO Brian Kelley reported that Keurig had "now sold more than 20 billion portion packs [and] more than 35 million brewers."[27]

105.    As of September 2013, Keurig's Single-Serve Brewers were among the top four best-selling coffeemakers in the United States by dollar volume.[28]

106.    In the first quarter of 2014, Keurig had already sold a record 5.1 million Single-Serve Brewers.[29]

107.    Despite market hurdles, Keurig was the dominant retailer of Single-Serve Brewers from 2011 to 2016 throughout North America, selling dozens of times the volume of its two largest competitors combined by units sold.[30] During this time period, Keurig's largest competitor, Nestle, did not sell even 1/10th of the units sold by Keurig in North America.[31]

108.    Keurig has the power to exclude competition in the Single-Serve Brewer Market. Keurig has unlawfully exercised its power to exclude competition in the Single-Serve Brewer Market by coercing distributors and retail customers to enter into exclusive agreements, which require that only Keurig Single-Serve Brewers be sold or used by these entities.

109.    Barriers to entry are high and formidable for any potential entrant into the Single-Serve Brewer Market. Keurig still holds patents that cover its Single-Serve Brewers. Successful entry into the Single-Serve Brewer Market requires substantial technological know-how, research and design capabilities, and capital investment. Moreover, retailers are reluctant to stock Single-

---

[27] Green Mountain Coffee Roasters' CEO Hosts Annual Meeting of Shareholders (Transcript) (Mar. 6, 2014), http://seekingalpha.com/article/2073423-green-mountain-coffee-roasters-ceo-hosts-annual-meeting-of-shareholderstranscript at p. 5.
[28] *See* GMCR 2013 10-K at p. 8.
[29] Green Mountain Coffee Roasters Reports First Quarter Fiscal Year 2014 Results Including a Record 5.1 Million Keurig Brewers Sold in the Period (Feb. 5, 2014 Press Release), https://www.businesswire.com/news/home/20140205006477/en/Green-Mountain-Coffee-Roasters-Reports-Quarter-Fiscal.
[30] Matthew Barry, *Keurig's Dominance Is Proving a Hindrance To Pod Coffee Expansion in North America* Euromonitor International (April 23, 2017), https://blog.euromonitor.com/2017/04/keurigs-dominance-proving-hindrance-pod-coffee-expansion-north-america.html
[31] *Id.*

Serve Brewers unless the Portion Packs they use are readily and widely available. Portion Packs that are compatible with any particular Single-Serve Brewer are not widely available unless the corresponding brewer is popular. In light of the foregoing, potential market entrants face a substantial competitive disadvantage vis-à-vis established Single-Serve Brewer suppliers.

## II.   Keurig Has Monopoly Power In The Compatible Cup Market

110.   Keurig dominated the Compatible Cup Market during the relevant period, maintaining a market share in excess of 80%. In February 2014, Keurig's President and CEO, Brian Kelley, admitted during a conference call with financial analysts that Keurig controlled 86% of the Compatible Cup Market.[32]  The remaining 14% of the Compatible Cup Market was composed of sellers of unlicensed and private label Competitor Cups.  In an effort to reclaim its market share, which started at 100% when its patents expired, Keurig reinforced its anticompetitive scheme by, among other actions, furthering its web of exclusionary arrangements through the Compatible Cup supply and distribution chain.

111.   Keurig has also entered into agreements with other coffee roasters and beverage brands to license the right to manufacture, distribute, and/or sell K-Cups through its distribution channels bearing the trademarks of various major players in the coffee industry, such as Starbucks, Kraft, Peet's, Dunkin' Donuts, Smucker, and the Coffee Bean & Tea Leaf, using those brand owners' marks. As of November 2014, Keurig either owned or licensed some 49 brands. By 2018, that figure had risen to more than 75 "owned, licensed and partner brands in the Keurig system."[33]

---

[32] *See* GMCR, FQ1 2014 Earnings Call Tr. at 15 (Feb. 5, 2014) ("We had 100% of the system ... and all of a sudden we have 86% ...."); *see also* Citi Report, DD's K-Cup Corner v8.13 at 2 (July 18, 2013) (noting Keurig controlled 92% of the K-Cup market in 2013).

[33] Richard Craver, *Krispy Kreme parent company plans to combine Keurig with Dr Pepper Snapple*, Winston-Salem Journal (Jan. 30, 2018), https://www.greensboro.com/business/local_business/krispy-kreme-parent-company-plans-to-combine-keurig-with-dr/article_54f3b9a3-ca5e-5d89-9b9e-efa8ad1d346b.html

112.     Keurig exercises control over, and benefits from the sale of, licensed K-Cups, making the sale of licensed K-Cups essentially equivalent from Keurig's perspective to the sale of Keurig's K-Cups. As Keurig Spokeswoman Katie Gilroy described, Keurig is "indifferent as to whether [it is] selling [its] own brand or a licensed pack." Indeed, when Keurig reports its market share numbers, it typically includes its licensees in reported Keurig share numbers.

113.     Keurig was taken private in 2016 by the European investment company JAB Holding, which historically does not release sales figures for companies it owns.[34] In January 2018, industry analysis still put Keurig's market share of US coffee pod sales at 80%.[35]Industry analysts predicted a continued high market share for Keurig due to "its strong portfolio of over 75 owned and licensed coffee brands."[36]

114.     Keurig's monopoly power was also furthered by businesses it owns that sold K-Cups during the relevant period, such as Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee Inc., and LNH Holdings, Inc. (Van Houtte).

115.     Because Compatible Cups are not reasonably interchangeable with other Portion Packs,[37] Keurig locks consumers in to using Compatible Cups by selling its K-Cup Brewers at or below cost.[38] Keurig is then able to recoup and greatly exceed losses on its sales of K-Cup Brewers by obtaining a 50% margin or more on its K-Cups sales.[39]

---

[34] Zeke Turner and Julie Jargon, *The Secretive Company that Pours America's Coffee*, THE WALL STREET JOURNAL, (Mar. 7, 2018), https://www.wsj.com/articles/the-secretive-company-that-pours-americas-coffee-1520440633
[35] *See* Moody's Investors Service*, Moody's changes Keurig's outlook to positive; affirms Ba2 rating* (Jan. 17, 2018), https://www.moodys.com/research/Moodys-changes-Keurigs-outlook-to-positive-affirms-Ba2-rating--PR_378061
[36] *Id.*
[37] *See*, *supra* Relevant Markets, I(B).
[38] GMCR 2015 10-K at p. 2: "As part of our strategy, we work to sell our at-home hot system brewers at attractive price points which are approximately at cost, or at a loss when factoring in the incremental costs related to sales, in order to drive the sales of profitable portion packs."
[39] *See* Green Mountain 2013 Investor Day Presentation, (Sept. 10, 2013), at p. 164, (located in Bloomberg's archives); *see also* Direct Purchaser Plaintiffs' Amended Consolidated Class Action Complaint, 1:14-md-02542-VSB-HBP, D.E. 237, ¶ 100.

116.    Keurig sold billions of dollars in K-Cups annually during the relevant period. In fiscal year 2012, Keurig's net sales were $3.9 billion, with 90% of these consolidated net sales resulting from the combined sales of Single-Serve Brewers (which comprised 22%, or $760 million) and Portion Packs including K-Cups (which comprised 78%, or $2.7 billion).[40] In fiscal year 2013, Keurig sold approximately $3.187 billion in Portion Packs, including K-Cups.[41] In fiscal year 2015, Keurig sold approximately $3.645 billion in Portion Packs, including K-Cups.[42]

117.    Indeed, during the relevant period Keurig has been able to exercise its monopoly power in the Compatible Cup Market by profitably raising K-Cup prices by at least 10% to 15% above competitive levels for extended periods of time without losing significant market share.

118.    Upon information and belief, Keurig also entered into exclusionary agreements with office specialty stores, such as Staples. Competitors of Keurig sought to supply Compatible Cups to Staples, but Staples had an exclusive licensing agreement with Keurig. As a result of that restrictive agreement, Keurig's competitors were unable to enter into a supply arrangement with Staples.

119.    Keurig has admitted that it has more than 500 Keurig Authorized Distributors, who are contractually obligated to buy directly from Keurig and to only sell products that are "authorized" by Keurig.

## ADDITIONAL FACTUAL ALLEGATIONS

120.    Upon acquiring Keurig, Incorporated in 2006, GMCR embarked on a multifaceted campaign to unlawfully dominate and exclude competition in the Compatible Cup Market. The scheme consisted of several steps, including blocking Internet sales; anticompetitive acquisitions;

---

[40] *See* GMCR 2012 Annual Report, http://investor.keuriggreenmountain.com/static-files/e4ccbde6-9847-4b2e-9466-98fedeaa4bb1 ("GMCR 2012 10-K") at p. 2
[41] *See* GMCR 2013 10-K at p. 38.
[42] GMCR 2015 10-K at p. 6

sham litigation; numerous exclusionary agreements at multiple levels of the Compatible Cup supply and distribution chain; disseminating false, misleading, and disparaging statements about the quality and performance of Competitor Cups; and even changing the design of its brewers to exclude competition.

**I.     Keurig Attempts To Prevent Internet Distributors From Selling To Customers In the At-Home Market Segment**

121.   First, upon information and belief, in 2006, Keurig endeavored to control distribution of Compatible Cups to consumers in the At-Home Market Segment by forcing distributors to exit this highly valuable market in which they had invested substantial sums. At least two distributors objected to this strong-arm tactic by commencing an action in federal court.

122.   In December 2006, Evans Quality Coffee Service ("Evans") and Springtime, Inc. d/b/a Springtime Coffee, Co. ("Springtime") sued Keurig in the United States District Court for the District of New Jersey. According to the pleadings in the *Evans* lawsuit, Evans and Springtime alleged that they were distributors of Keurig's brewers and Portion Packs in the Away-From-Home Market Segment and were later authorized to sell Keurig products nationwide over the Internet, including to the At-Home Market Segment. Evans and Springtime further alleged that they spent hundreds of thousands of dollars to develop the infrastructure necessary to distribute Keurig products to consumers via the Internet. However, after GMCR acquired Keurig, Inc. and had the ability to distribute via the Internet, Keurig prohibited Evans and Springtime, and allegedly seven other distributors, from selling to consumers in the At-Home Market Segment over the Internet. Specifically, Keurig allegedly used its power to force Evans and Springtime into signing a new distribution agreement as a condition to keep their Keurig Away-From-Home business. Prior to resolving the lawsuit, the *Evans* Court issued a preliminary injunction ordering Keurig to honor the

pre-acquisition agreements allowing Evans and Springtime to continue sales to consumers over the Internet.

## II.   Keurig Aggressively Eliminated Potential Competitors Through Successive Acquisitions

123.   Keurig aggressively eliminated potential competitors, all licensees of Keurig patents, with the ability to sell during and after patent expiration, through successive acquisitions of Tully's Coffee Corporation (2009), Timothy's Coffees of the World, Inc. (2009), Diedrich Coffee, Inc. (2010), and LNH Holdings, Inc. (Van Houtte) (2010).

| Date | Target | Price |
|---|---|---|
| March 27, 2009 | Tully's Coffee | $40.3 million |
| November 13, 2009 | Timothy's Coffee | $155.7 million |
| May 11, 2010 | Diedrich | $305.3 million |
| December 17, 2010 | Van Houtte | $907.8 million |

124.   One analyst stated Keurig "eliminated the licensees by buying them. [Keurig] paid high prices to avoid having to compete with the licensees."[43] According to that analyst, these acquisitions made no business sense but for their value in eliminating potential competitors when Keurig's patents expired.[44]

125.   Having grown into a billion dollar publicly traded company by eliminating and restraining competition, by 2010 Keurig was poised to exercise its monopoly power without fear that market entrants could constrain its prices.

## III.   Keurig Pursued Sham Litigation To Restrain Competition

126.   For many years, Keurig's monopoly in the Compatible Cup market was protected by its K-Cup filter patents covering the use of filters in Compatible Cups. However, the two principal patents associated with Keurig's filtered K-Cups expired in September 2012.

---

[43] David Einhorn, GAAP-uccino, *Greenlight Capital Value Investing Congress* (Oct. 17, 2011), at p. 53.
[44] *Id.* at 49.

127.     Despite Keurig's patent protection, some competitors were able to enter the market prior to September 2012 by creating filter-less Compatible Cups that did not infringe Keurig's K-Cup filter patents. One such competitor, TreeHouse, decided to enter the Compatible Cup Market in or about 2010.

128.     Thus, in August 2010, TreeHouse subsidiary Sturm introduced the first Compatible Cups for use in K-Cup Brewers that were not sold by Keurig or under a Keurig license.

129.     In response to Sturm's market entrance, Keurig filed a baseless lawsuit (asserting various infringement, trademark, and false advertising claims) on October 1, 2010, in the United States District Court for the District of Delaware. Just weeks after Sturm's Compatible Cups hit the shelves, Keurig sued Sturm, alleging, in bad faith, that Sturm's Compatible Cups infringed Keurig's patents directed at brewers and methods of using brewers—not even asserting any patents covering K-Cups themselves. Keurig also alleged that Keurig's own consumers were infringing Keurig's patents on the K-Cup Brewers by using Sturm's unlicensed Compatible Cups, and that Sturm was thus also liable for "inducing" infringement by these consumers.

130.     No reasonable litigant could have realistically expected to succeed on the merits of such claims, and, thus, Keurig's complaint was objectively baseless. The action was also subjectively baseless because Keurig filed the action to interfere with its competitor.

131.     Sturm asserted the affirmative defense of patent exhaustion and moved for summary judgment of non-infringement.

132.     In September 2012, the United States District Court for the District of Delaware granted summary judgment in favor of Sturm on Keurig's patent claims.

133.     Most importantly, the Court held that method patents are exhausted by selling merchandise that embodies the method. Quoting the Supreme Court in Quanta Computer, Inc. v. LG

Elecs., Inc., the court stated that "the authorized sale of an article that substantially embodied a patent exhausted the patent holder's rights and prevented the patent holder from invoking patent law to control post-sale use of the article."[45] Expanding on the Supreme Court's holding, the Sturm Court held:

> [P]atent holders may not invoke patent law to enforce restrictions on the post-sale use of their patented products. After the first authorized sale to a purchaser who buys for use in the ordinary pursuits of life, a patent holder's patent rights have been exhausted.[46]

134.    Keurig appealed that decision to the United States Court of Appeals for the Federal Circuit. The Federal Circuit affirmed the District Court's ruling and held, on October 17, 2013, that Keurig was not seeking the proper enforcement of any patent rights, but was rather trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished."[47]

(a)    The Federal Circuit's holding was clear:

> Keurig sold its patented brewers without conditions and its purchasers therefore obtained the unfettered right to use them in any way they chose, at least as against a challenge from Keurig ... Here, *Keurig is attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig cartridges* by invoking patent law to enforce restrictions on the post-sale use of its patented product.[48]

135.    The Court noted that the result sought by Keurig "would violate the longstanding principle that, when a patented item is 'once lawfully made and sold, there is no restriction on [its] use to be implied for the benefit of the patentee.'"[49]

136.    Keurig also sued another early Compatible Cup Market entrant, Rogers, making similar claims. In Keurig's litigation against Rogers, a different federal district court likewise held

---

[45] 553 U.S. 617, 638 (2008).

[46] *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762 (D. Del. Sept. 13, 2012) (*quoting Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 615 F. Supp. 2d 575, 582 (E.D. Ky. 2009)).

[47] *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

[48] *Id.* (emphasis added).

[49] *Id.* (quoting *Quanta Computer, Inc. v. LG Elec., Inc.*, 553 U.S. 617, 630 (2008) (quoting *Adams v. Burke*, 84 U.S. 453, 457 (1873))).

on summary judgment that the Compatible Cups at issue could not infringe Keurig's brewer method patents under the doctrine of patent exhaustion.[50]

137.    Keurig's lawsuits were objectively baseless and had no realistic expectation for success on the merits. Keurig's lawsuits were also subjectively baseless attempts to directly interfere with the business relationships of its competitors.

## IV.    Keurig Entered Into Numerous Anticompetitive Agreements At Multiple Levels Of The Compatible Cup Supply And Distribution Chain

### A.    Keurig Prevented Potential Competition Through Anticompetitive Licensing Agreements

#### 1.    Examples of Keurig's Exclusive Agreements With Competitor Roasters.

138.    As discussed above, Keurig entered into numerous horizontal multi-year agreements to convert competing coffee roasters and brands, including some of the world's largest coffee retailers.  Keurig's agreements with licensed roasters and brands harm competition because, among other things, they prevent these brands from also licensing trademarks or entering into manufacturing agreements with Keurig's competitors in the Compatible Cup Market.

139.    For example, in March of 2014, Keurig and Starbucks amended their agreement to expand the range of Starbucks K-Cup offerings and to eliminate the requirement that Starbucks be the only super-premium coffee brand available in K-Cups. This amendment enabled Keurig to bring Peet's—one of Green Mountain's and Starbucks' main competitors—into what Keurig describes as the licensee "family."[51]

---

[50] *Keurig, Inc. v. JBR, Inc.*, No. CIV.A. 11-11941-FDS, 2013 WL 2304171, at *15 (D. Mass. May 24, 2013), aff'd, 558 F. App'x 1009 (Fed. Cir. 2014)

[51] *see also*, "Keurig Green Mountain and Starbucks Amend Agreement", STARBUCKS STORIES & NEWS (Mar. 14, 2014), https://news.starbucks.com/news/starbucks-and-keurig-green-mountain-amend-agreement; Phil Wahba, *Starbucks gives up exclusive license to high-end Keurig pods*, CHICAGO TRIBUNE (Mar. 14, 2014), https://www.chicagotribune.com/business/ct-xpm-2014-03-14-sns-rt-us-starbucks-keuriggreenmountain-20140314-story.html; Ben Fox Rubin, *Starbucks to End Exclusivity Deal with Keurig*, THE WALL STREET JOURNAL (Mar. 14, 2014), https://www.wsj.com/articles/starbucks-to-end-exclusivity-deal-with-keurig-1394802962.

140.    Within hours of Keurig announcing the amended Starbucks deal, Keurig and Northern California-based Peet's announced that they had reached a multiyear manufacturing and distribution agreement for Peet's specialty coffee and tea K-Cups.[52] Under this agreement, Keurig will grind Peet's coffee and package it in K-Cups, and Peet's will distribute the K-Cups to grocery stores, mass merchandisers, club stores, Peet's retail stores, and the Peet's website, while Keurig will distribute Peet's K-Cups to specialty and department stores and Away-From-Home channels and sell them through the Keurig.com website.[53] In just seven months prior to its agreement with Keurig, Peet's experienced "incredible growth and success in the single cup category" and was the largest unlicensed super-premium single serve coffee.[54] Peet's RealCups™ were already "available in over 12,000 stores nationwide."[55] The key to Peet's sudden success appears to be the deal's grant of access to the markets that were otherwise foreclosed by Keurig's anticompetitive conduct.

141.    Beginning January 1, 2014, Keurig began announcing additional multi-year exclusive agreements converting its competitors across all market segments. These competitors include:

---

[52] Keurig Adds Peet's Coffee, Alters Starbucks Deal (Mar. 17, 2014),
https://www.manufacturing.net/home/news/13172411/keurig-adds-peets-coffee-alters-starbucks-deal.
[53] Keurig Green Mountain and Peet's Coffee & Tea Announce Partnership (Mar. 14, 2014 Press Release),
https://www.businesswire.com/multimedia/home/20140314005375/en/.
[54] *Id.*
[55] Keurig competitor Mother Parkers Tea & Coffee is the owner and manufacturer of the RealCup™ technology and brand.

(a) Branded beverages Krispy Kreme,[56] Lavazza,[57] Laura Secord® hot chocolate,[58] and Café Bustelo;[59]

(b) Private Label K-Cups for BJ's Wholesale Club Wellsley Farms® coffee,[60] available exclusively at BJ's locations, through Business to Business ("B2B") sales and on BJs.com;

(c) Private Label K-Cups for national retailer Target, including its Archer Farms Brand;[61]

(d) Private Label K-Cups for W.B. Mason, the largest privately-owned office products dealer in the U.S.; and

(e) Private label K-Cups for Grocery Chains. Keurig is the exclusive manufacturer for:

   1. Harris Teeter® K-Cups to be sold in store and online at HarrisTeeter.com;[62] Meijer K-Cups, available exclusively at Meijer stores;[63] and

   2. Java Delight, to be sold by Supervalu, one of the largest grocery wholesalers and retailers in the U.S., in its company owned stores known as Cub Foods, Hornbachers, Shop n/ Save, Shoppers Food & Pharmacy, and Farm Fresh as well as in the 1,800 independent stores it serves.[64] Keurig "converted"

---

[56] The Joy of Krispy Kreme Comes to Keurig (Feb. 10, 2014 Press Release), https://www.businesswire.com/news/home/20140210005133/en/Joy-Krispy-Kreme-Keurig.
[57] Green Mountain Coffee Roasters and Lavazza to Bring the Flavors of Italy to Keurig (Feb. 20, 2014 Press Release), https://www.businesswire.com/news/home/20140220005296/en/Green-Mountain-Coffee-Roasters-Lavazza-Bring-Flavors.
[58] Green Mountain Coffee Roasters Partners with Laura Secord® to Create Hot Chocolate K-Cup®Packs for Keurig® Single Cup Brewers (Feb. 27, 2014 Press Release), https://www.newswire.ca/news-releases/green-mountain-coffee-roasters-partners-with-laura-secord-to-create-hot-chocolate-k-cup-packs-for-keurig-single-cup-brewers-513825051.html.
[59] Cafe Bustelo And Keurig Green Mountain Brew Up Single Cup Partnership (July 18, 2014 Press Release), https://www.prnewswire.com/news-releases/cafe-bustelo-and-keurig-green-mountain-brew-up-single-cup-partnership-267648391.html.
[60] BJ's Members Raise Your Mugs! Wellsley Farms Coffee Now Comes in Convenient K-Cup Packs (June 23, 2014 Press Release), https://www.businesswire.com/news/home/20140623005102/en/BJ%E2%80%99s-Members-Raise-Mugs%21-Wellsley-Farms-Coffee.
[61] Brian Kelley, Keurig Q3 2014 Earnings Call Transcript, (Aug. 7, 2014), https://seekingalpha.com/article/2392715-keurig-green-mountains-gmcr-ceo-brian-kelley-on-q3-2014-results-earnings-call-transcript ("The brands we have announced include Target and its Archer Farms brand, BJ's Wholesale Club and its Wellsley Farms brand, Harris Teeter and its store brand as well as Nestlé coffee-mate K-Cup packs.").
[62] Keurig Green Mountain to Bring the Keurig Brewed Seal to Harris Teeter K-Cup Packs (July 9, 2014 Press Release), https://news.keuriggreenmountain.com/press-release/business/keurig-green-mountain-bring-keurig-brewed-seal-harris-teeter-k-cup-packs.
[63] Keurig Green Mountain Welcomes Meijer K-Cup Packs into the Keurig Brewed Family (Oct. 23, 2014 Press Release), http://newsroom.meijer.com/news/keurig-green-mountain-welcomes-meijer-k-cup-packs-into-the-keurig-brewed-family.
[64] Keurig Green Mountain and SUPERVALU Announce New Java Delight for Keurig Hot Brewers (Oct. 30, 2014 Press Release), https://www.businesswire.com/news/home/20141030005088/en/Keurig-Green-Mountain-SUPERVALU-Announce-New-Java.

Supervalu from the Keurig compatible, environment friendly UnCup[TM] pod, introduced in September 2012.[65]

142.    In addition, Keurig has entered into numerous long-term, exclusionary licensing agreements with other competitor coffee brands. Many, if not all, of these agreements also unreasonably restrain trade because they dictate where and how licensed K-Cups can be sold, thereby allowing Keurig to allocate the Compatible Cup market and maintain supra-competitive prices across licensed brands by controlling output:

(a) In December 2006, Keurig entered into a multi-year agreement with Caribou under which Caribou branded coffee would be packaged and sold in K-Cups.[66] The parties renewed and amended their agreement in December 2011.[67] Under this agreement, Caribou may only sell the K-Cups at Caribou coffee stores and Caribou's website for "At Home" use only. Caribou further agreed to sell Keurig its coffee for Keurig's packaging into K-Cups and granted Keurig a license to use its trademarks in connection with the marketing and sale of Caribou K-Cups. Keurig's agreement with Caribou also contains a "Portion Pack Exclusivity" provision prohibiting Caribou from "sell[ing] coffee, Tea or Other Hot Beverage Products to any third party for the specific intended use of producing Keurig Portion Packs or any other product intended for use in the Keurig Brewing System."[68] The Caribou agreement also prohibits Caribou from "licens[ing] any trademarks for use by third parties" in connection with products "intended for use with the Keurig Brewing System."[69] The agreement also contains a "No Participation in Competing Systems" provision prohibiting Caribou from making or supporting Competitive Brewers, such as "Flavia, Kenco and Braun (the Tassimo system).";[70]

(b) In May 2013, Keurig entered into a multi-year agreement with The Coffee Bean & Tea Leaf, "the oldest and largest privately held specialty coffee and tea retailer in the United

---

[65] SUPERVALU Launches Java Delight Single Serve Coffee UnCup (Sept. 4, 2012 Press Release), http://www.businesswire.com/news/home/20120904006429/en/SUPERVALU-Launches-Java-Delight-Single-Serve-Coffee#.VFMNEPnF8g0.

[66] *See* QSR Magazine*, Keurig and Caribou Coffee Announce Partnership*, (Jan. 9, 2007), https://www.qsrmagazine.com/news/keurig-and-caribou-coffee-announce-partnership

[67] *See* ECF No. 237-2 at p. 1.

[68] *See* 2011 Caribou Agreement § 4 at 7.

[69] GMCR Press Release, Keurig Coffee Roasters, Inc. Welcomes The Coffee Bean & Tea Leaf to the Keurig Family (May 29, 2013), https://www.businesswire.com/news/home/20130529005443/en/Green-Mountain-Coffee-Roasters-Welcomes-Coffee-Bean.

[70] *Id*., Section 5 at 7.

States." Under the agreement, Coffee Bean K-Cups were sold "in a variety of channels" beginning in the spring of 2014;[71]

(c) In February 2014, Keurig and Krispy Kreme announced a multi-year agreement under which Krispy Kreme K-Cups will be available in the grocery, retail, and Away-From-Home channels, as well as in Krispy Kreme shops;

(d) In February 2014, Keurig and Luigi Lavazza S.p.A. announced a multi-year agreement to make Lavazza brand coffee available in K-Cups, to be sold at specialty, grocery, and Away-From-Home retailers;

(e) In July 2013, Keurig entered into a multi-year agreement with Cinnabon. Under the agreement, Keurig manufactured Cinnabon K-Cups which were sold in the retail and commercial channels, as well as in Cinnabon restaurants; and

(f) In August 2014, Keurig and Kraft Foods Group entered into a high-profile licensing, manufacturing, and distribution agreement to make Kraft's branded coffees—Maxwell House®, Gevalia®, Yuban®, and McCafe®—available in Keurig K-Cup format and eliminating Keurig's largest unlicensed competitor remaining in the market. Kraft's coffee brands had 5.4% of the Compatible Cup market.

143.    Upon information and belief, Keurig has also entered into similar anticompetitive agreements with Newman's Own Organics Coffee®, Gloria Jean's Coffee®, and Wolfgang Puck®.

144.    According to one analyst report dated October 17, 2011, the "only meaningful coffee brands that [Keurig] does not have in its portfolio are Maxwell House (*i.e.*, Kraft) and Peet's."[72] As previously mentioned, Keurig then entered into agreements with both of these companies in 2014, giving Keurig control over Compatible Cup sales for all or virtually all prominent coffee brands, as well as some of the largest, if not the largest, tea brands.

145.    Upon information and belief, Keurig has also entered into agreements to manufacture and distribute non-coffee products with companies such as Bigelow®, Twinings®, Swiss Miss®, Snapple®, Celestial Seasonings®, Campbell's®, and Coca-Cola®.

---

[71] GMCR Press Release, Keurig Coffee Roasters, Inc. Welcomes The Coffee Bean & Tea Leaf to the Keurig Family (May 29, 2013), https://www.businesswire.com/news/home/20130529005443/en/Green-Mountain-Coffee Roasters-Welcomes-Coffee-Bean.
[72] David Einhorn, GAAP-uccino, *Greenlight Capital Value Investing Congress* (Oct. 17, 2011), at p. 44.

### 2. Keurig Insists That Competitor Cup Makers Must Pay Unjustified Royalties to Become "Authorized" To Access Keurig Brewers

146.     Keurig insists that Competitor Cup makers take a purported "license" or become "authorized" to sell Competitor Cups or to have access to Keurig's extensive distribution network.

147.     As Brian Kelley stated during the November 20, 2013 investor call, Keurig "will continue to convert current unlicensed players into licensed Keurig system partners," noting that "obviously [its] goal" is to "convert ... as many [Competitor Cup makers] as [it] can."[73]

148.     Industry analyst Stifel has explained that Keurig viewed its "introduction of Keurig 2.0 ... as an opportunity to convert unlicensed [Competitor Cup makers] to licensed partners." It further observed that "Green Mountain is pushing retailers on the need to become a licensed partner before the system closes to prevent losing consumer relevance."

149.     In order to become an "authorized" or "licensed" "Keurig system partner," however, Keurig demands that its purported "licensees" cede their independent decision-making authority to Keurig as to where and how many Competitor Cups can be sold by the "licensee." Such agreements have the effect of allocating markets, restraining output, and allowing Keurig to maintain supra-competitive prices.

150.     Keurig additionally demands a royalty payment or other consideration under the purported "license," despite the fact that its K-Cup filter patents expired in 2012. Such monopoly rents have the effect of raising rivals' costs, increasing prices, and restraining free and fair competition on the merits.

---

[73] Green Mountain Coffee Roasters' CEO Discusses F4Q 2013 Results - Earnings Call Transcript (Nov. 20, 2013), https://seekingalpha.com/article/1853341-green-mountain-coffee-roasters-ceo-discusses-f4q-2013-results-earnings-call-transcript.

151.    Indeed, Keurig's Investor Day slides, dated September 10, 2013, make no claim that Keurig's new "interactive" brewer technology used to "recognize licensed portion packs" and to exclude Competitor Cups is patented.

152.    Keurig used the 2.0 K-Cup Brewer launch to coerce Competitor Cup makers to enter into anticompetitive agreements with Keurig by enlisting the help of Competitor Cup makers' retail customers. Specifically, Keurig contacted retailers leading up to the launch of the 2.0 K-Cup Brewer to inform them that the Competitor Cups they were purchasing would not work in 2.0 K-Cup Brewers and then inducing those retailers to urge their suppliers of Competitor Cups to contact Keurig to become "authorized" or "licensed" partners.

153.    Thus, Keurig's efforts to "convert" "unlicensed" competitors, such as TreeHouse and Rogers, to "licensed" or "authorized" Keurig manufacturers only increased in the lead up to the release of 2.0 K-Cup Brewers. The Federal Circuit's decision in the Sturm litigation held that Keurig's assertion of brewer patents was an impermissible attempt to restrict consumers' use of Competitor Cups in 1.0 K-Cup Brewers did not adequately resolve this controversy. That litigation did not involve any patents on K-Cups or their components themselves, nor did it involve 2.0 K-Cup Brewers.

### 3.  Keurig's Web of Agreements Between Roasters and Distributors Unlawfully Restrain Competition

154.    Keurig's web of exclusive agreements with distributors, and licensed roasters and brands harm competition because they restrain an enormous amount of competition throughout the entire Compatible Cup supply and distribution network.

155.    Upon information and belief, Keurig has entered into this web of anticompetitive and unduly restrictive exclusionary agreements with coffee roasters and/or coffee and other beverage

brands to maintain its monopoly position in the Compatible Cup Market by excluding competitors who refuse to allow Keurig to dictate the pricing, geographical territory, market segments, and/or channels of distribution in which Compatible Cups may be sold.

156. Through these agreements, Keurig can limit competition from lower-priced Competitor Cups by agreeing not to produce or support competitive Single-Serve Brewers and not to do business with Competitor Cup makers unless they also become licensed and agree to anticompetitive terms that exclude competitors and allow Keurig to maintain artificially elevated prices. These anticompetitive restrictions are not reasonably necessary or tailored to achieve any procompetitive benefit.

157. Because Keurig's exclusionary agreements dictate where and how licensed K-Cups can be sold, they allow Keurig to maintain supra-competitive prices across licensed brands by controlling output. Because Keurig limits the output of licensed K-Cups, selling out quickly by offering lower prices would not benefit a licensee because the brand could not simply restock its product to get the benefit of additional sales. This creates a further incentive for Keurig-licensed coffee brands to renew their agreements with Keurig and to refuse to deal with any Compatible Cup maker that refuses to take a license or become "authorized" by Keurig, as demanded by Keurig as a pre-condition for selling Compatible Cups.

158. Keurig's agreements with roasters and brands further restrain competition in the downstream markets for the sale and distribution of Compatible Portion Packs by giving Keurig access to and control over those companies' pre-existing distribution networks. Those distribution networks are converted into Keurig Authorized Distributors that are prohibited from doing business with Competitor Cup makers. For example, a company providing distribution for a roaster that enters

into a non-competition agreement with Keurig becomes a "Roaster Nominated Keurig Authorized Distributor" or "RNKAD," which is defined by Keurig as:

> A company that was nominated by a Licensed Roaster and has an effective distribution agreement with Keurig that specifies a geographical territory and channels of distribution. These companies purchase Keurig Products from Keurig and exclusively the nominating Licensed Roaster's K-Cups from the nominating Licensed Roaster, K[eurig]A[authorized]R[e-]D[istributor]s, or Keurig for resale.[74]

159.    Many Keurig distributors are prohibited from selling Competitor Cups because doing so would violate the signed Keurig Authorized Distributor ("KAD") Agreements.

160.    For example, by the Amended and Restated Purchase and License Agreement entered into between Keurig and Caribou Coffee Company, Inc. ("Caribou"), on December 20, 2011, Caribou is prohibited from selling Competitor Cups.[75] The Caribou agreement expressly recites the fact that "Keurig Authorized Distributors" and "Keurig Authorized Re-Distributors" enter into "distribution agreement[s] with Keurig that specif[y] a geographical territory and channels of distribution for the purchase ... of [both bulk and non-bulk] quantities of Keurig Brewers from Keurig and Keurig Portion Packs from Licensed Roasters, [other authorized distributors], or Keurig for resale."[76]

161.    Together, these agreements severely restrict competition, thereby harming Competitor cup makers, direct purchasers, and the Single-Serve Brewer, Compatible Cup, and Portion Pack Markets. Through these exclusive agreements, Keurig has eliminated competition with the largest roasters and brands that would otherwise have the most financial incentives to enter into the Single-Serve Brewer Market and to work with Competitor Cup makers to increase output or

---

[74] License and Distribution Agreement between Keurig, Inc. and Diedrich Coffee, Inc. (Jul. 29, 2003), at 5, http://www.sec.gov/Archives/edgar/data/947661/000119312508208074/dex1037.htm.
[75] See 2011 Caribou Agreement § 5.
[76] Id. § 1.11.

decrease prices. By demanding that companies who contract with Keurig for the supply of K-Cups accept provisions prohibiting those companies from making or selling K-Cup Brewers, Keurig is leveraging its monopoly in the Compatible Cup Market to unlawfully maintain its monopoly in the Single-Serve Brewer Market.

162. The restraint on competition in the Single-Serve Brewer Market, in turn, further restrains competition in the Compatible Cup Market by eliminating new brewers that could otherwise increase demand for Competitor Cups. Thus, the restraint on K-Cup Brewer sales serves to further reduce output and maintain supra-competitive K-Cup prices.

163. Because Keurig's K-Cup patents have expired, there is no legitimate justification for these anticompetitive restrictions, such as division of markets across competitors, or the restraints placed on dealing with Competitor Cup makers, that could plausibly be grounded in any valid patent rights. Keurig cannot demand that Competitor Cup makers take a purported "license" or become "authorized" to sell Competitor Cups.

164. Keurig's lawful right to exclude Competitor Cup makers from the Compatible Cup Market expired when the patents protecting its K-Cup technology expired in September 2012. Keurig cannot extend this right beyond the term it was granted by the U.S. Patent Office simply because it was the first to make K-Cup Brewers or K-Cups. These anticompetitive agreements are not reasonably necessary nor tailored to achieve any procompetitive benefit. Rather, they are naked restraints on competition agreed to by companies that would be direct horizontal competitors but for their agreement not to compete.

165. These agreements, with some of the largest beverage brands in the world, substantially foreclose and unreasonably restrain an enormous amount of competition.

166.    Keurig's exclusive distribution agreements compound the anticompetitive effects of its agreements with roasters by substantially foreclosing access not only to those roasters and brands, but also to the distributors that provide services for those roasters and brands.

167.    Keurig's success in eliminating competition is evidenced by its control of the market. In a November 14, 2013, presentation by Rabobank to the National Automatic Merchandising Association, entitled "In Pod We Trust,"[77] showed K-Cup market share as of September 2013 was as follows:



---

[77] "In Pod We Trust", National Automatic Merchandising Association, (Nov. 14, 2013), t https://manualzz.com/doc/22759613/in-pod-we-trust---national-automatic-merchandising-associ...?__cf_chl_jschl_tk__=0d2aa022fa1338e24de44b6e298d5c2db9bb4b81-1622150743-0-ARPiNnxuzaZl72hicNayWL1IE3L09pPjMrmGU5UYm3Tcde1r_g1-oUzeNc6vzmL6DnMgGZ75425hG0s2YDs2SrcKbFCroEaG94sZIN5NYuvZJDzHY-mA_Y1jL_2GCDVOSqXT4F4hFviMWC1MDMgZJHvFC47lZKO_Lxk7cUOMYWV57ucNyUmTz0L-Das6epiHz6CDcicZI9GKxLD7CgJONCzQMrF0PrWKl0wynFAGBKxUHmd4uqGgmgA5_WH_nkuVlFvtm6KDn6R_R4lxXgWZZJXNrWqEH1BbpPfgdaytXQRszAteJ4schNIcZqmVW35kA_GxqkjkAqCLyImeV47GOtRdLJuUuggGRGhBEgB4nkw62CvtGbSm-ZGRAgGoVRyf9uaO4qngy6Yv_LwWP_qPgIHrJULwCM39nfft3ovnyh4Ix8PVbJZusH1QMfS1u176Rqx8nwNgjpSKr8gTkW7l26qCLeiR14MoSoHLW-jtzyaV

168.    In September 2013, Keurig directly or through license agreements controlled more than 81.7% of the K-Cup drink market, including Green Mountain (45.1%), Smucker (14.3%), Starbucks (14.2%), Eight O'Clock (5%), and Caribou (3.1%). The chart lists "Private label, Others" as accounting for 11.6% of the K-Cup market but many of these offerings are also controlled by Keurig. For example, Keurig produces the private label Kirkland Signature® brand K-Cups for Costco, the largest U.S. Warehouse Club store, and produces and distributes other licensed brands as discussed herein.

169.    According to Keurig's own data for the fiscal year ending August 4, 2013, Keurig controlled 92% of the Compatible Cup market, broken out as 48% Owned Brands, 22% Partner Brands, 18% Licensed Brands, and 3% Licensed Premium Store Brands. The remainder of the market, a year after patent expiration, consisted of 5% of Unlicensed Brands and 3% of Unlicensed Private Label K-Cups.

170.    The "2014 Harris Poll EquiTrend® Coffee Brand of the Year," revealed that Keurig owned or licensed the top seven coffee brands: 1. Dunkin' Donuts, 2. Green Mountain Coffee, 3. Folgers, 4. Seattle's Best, 5. Maxwell House, 6. Caribou, and 7. McCafe.[78]

### B. Keurig Coerced Machine Manufacturers and Component Suppliers to Enter into Long-Term, Exclusive Contracts Denying Competitors Access To Equipment and Materials

171.    Because competitor Compatible Cups were high-quality, less-expensive, and environmentally friendly, consumers started to buy competitor Compatible Cups over K-Cups, and as a result, Keurig's dominant share of the Compatible Cups market started to gradually erode. Keurig responded quickly by coercing machine manufacturers and components suppliers to enter into long-term, exclusive contracts that categorically denied competitor access to the equipment and

---

[78] "2014 – Coffee", The Harris Poll, available at https://theharrispoll.com/2014-coffee/.

materials necessary to manufacture Compatible Cups. As a result of these and other anticompetitive actions, Keurig recaptured most of the Compatible Cup market, so that by November 2014, it controlled approximately 95% of that market.

172.    Keurig has entered into unduly restrictive, anticompetitive, and exclusionary agreements with sellers of the machinery and components used to make K-Cups. For example, Keurig restricts the ability of machinery manufacturers to sell machinery to Keurig competitors who intend to use it to make Compatible Cups, but allows machinery manufacturers to sell the same machinery for other purposes. These anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups.

173.    Suzanne DuLong, Keurig's Director of Investor Relations, has stated that there are only two companies in the world making K-Cup packaging equipment and both are under contract with Keurig. Thus, Keurig's web of exclusive dealing agreements has further enabled it to impose an unlawful monopoly in the Compatible Cup Market.

174.    These agreements were used as a shield to insulate Keurig from competition by TreeHouse and Rogers. TreeHouse allegedly attempted to purchase a Spee-Dee Holmatic machine from R.A. Jones & Co. ("R.A. Jones") to manufacture non-filtered Compatible Cups. On December 19, 2013, a Sales Manager from R.A. Jones allegedly responded in an email, stating:

175.    "I am quite embarrassed to be writing this email, but it needs to be done. R.A. Jones is declining to quote the new machine for soluble, non-filtered product."[79]

---

[79] Complaint at ¶ 179, *Treehouse Foods, Inc. v. Keurig Coffee Roasters, Inc.*, No. 14-cv-00905 (S.D.N.Y. Feb. 11, 2014).

176.    Under "the rules," as described by the R.A. Jones sales manager: "if the cup goes into a Keurig brewer, [R.A. Jones] cannot quote it." However, R.A. Jones can still "build equipment for all types of packages, just not K-Cups or anything that goes into a Keurig brewer."[80]

177.    According to TreeHouse, the R.A. Jones sales manager expressed hope that the Keurig "agreement will be re-written to allow [R.A. Jones] to pursue this [non-filter Compatible Cup machinery] business" with TreeHouse.[81]

178.    Keurig also unreasonably restrains competitors' access to the inputs necessary to make Compatible Cups.

179.    Upon information and belief, Compatible Cups are made from several components, including a plastic cup, a foil lid, and a filter. There are few suppliers for each of these components because Compatible Cup components must generally be custom engineered for use in K-Cup Brewers. Keurig has entered into exclusive dealing agreements with suppliers of each K-Cup component, which has forced potential competitors to work with less experienced suppliers at a higher cost to these potential competitors.[82]

180.    Upon information and belief, in 2010, the three main domestic suppliers of the plastic cups used in K-Cups were Winpak Ltd. ("Winpak"), Phoenix Cups, and Curwood, which at the time collectively accounted for all or nearly all of the market for the sale of cup components used to produce K-Cups.[83]

181.    Upon information and belief, Keurig competitor TreeHouse approached all three of these companies to find a supplier to make Compatible Cups.[84]

---

[80] *Id.* at ¶ 180.
[81] *Id.* at ¶ 181.
[82] *Id.* at ¶ 187.
[83] *See id.* at ¶ 188.
[84] *See id.* at ¶ 189.

182.     Upon information and belief, at that time, Winpak was already supplying TreeHouse subsidiary Sturm with different types of cups and lids to make products that were not used in K-Cup Brewers. TreeHouse contacted Winpak to see if Winpak could also supply cups and lids to make Compatible Cups. After TreeHouse informed Winpak that the cups and lids it sought to purchase were intended for use in K-Cup Brewers, Winpak refused to supply these materials to TreeHouse. Winpak still supplies Sturm with lids for products that are not used in K-Cup Brewers.[85]

183.     Upon information and belief, TreeHouse also met with Phoenix Cups to see if Phoenix could supply the plastic cups needed to make Compatible Cups. Phoenix initially agreed to supply TreeHouse and even began customizing the cups per TreeHouse's requirements. However, shortly thereafter, Phoenix informed TreeHouse that it could not supply TreeHouse with plastic cups for use in K-Cup Brewers due to concerns that TreeHouse was not an "authorized manufacturer" for Keurig.[86]

184.     Because, upon information and belief, Phoenix was free to supply plastic cups for use in products not intended for K-Cup Brewers. Any restriction prohibiting Phoenix from dealing with TreeHouse cannot be justified on the purported basis that an exclusive agreement was necessary to ensure a reliable supply of cups for Keurig.

185.     Upon information and belief, TreeHouse then contacted Curwood, the only remaining domestic supplier of plastic cups used to make Compatible Cups known at that time. Shortly after the initial meeting, during which the parties discussed the possibility of Curwood supplying TreeHouse with plastic cups for use in K-Cup Brewers, Curwood informed TreeHouse that Curwood could not work with TreeHouse due to Curwood's other "obligations."[87]

---

[85] *See id.* at ¶ 190.
[86] *See id.* at ¶ 193.
[87] *See id.* at ¶ 196.

186.    Upon information and belief, as a direct result of these suppliers' refusal to supply TreeHouse with the materials necessary to make Compatible Cups, TreeHouse was forced to develop new cups with a company that was not at that time in the business of manufacturing Compatible Cup components. Developing new cup components was a more costly and lengthy process as compared to purchasing cup materials from a company that already produced such components. TreeHouse incurred additional, unnecessary costs by dealing with a company that lacked the know-how and expertise required to manufacture cups for use in K-Cup Brewers. As a result, TreeHouse's start-up costs were substantially higher than they would have been if TreeHouse had been free to purchase cups from an experienced cup manufacturer.[88]

187.    Upon information and belief, TreeHouse also approached Winpak and LMI Packaging Solutions ("LMI"), domestic suppliers of foil lids used to make Compatible Cups, to find a supplier for its Compatible Cups' foil lids.[89]

188.    As detailed above, Winpak allegedly refused to supply TreeHouse with lids after learning that TreeHouse intended to use the lids in Compatible Cups.

189.    Upon information and belief, LMI, then a supplier to TreeHouse of other cups and lids, also allegedly refused to supply TreeHouse with foil lids to make Compatible Cups, citing other business commitments. These "other business commitments" were to Keurig. After its initial refusal, LMI later informed TreeHouse that it no longer had a relationship with Keurig, and was, therefore, now free to do business with TreeHouse.[90]

190.    Upon information and belief, once again, because TreeHouse was unable to contract with experienced domestic lid suppliers, it had to incur additional unnecessary costs by dealing with

---

[88] *See id.* at ¶ 198-99.
[89] *See id.* at ¶ 200.
[90] *See id.* at ¶ 202-03.

a company that lacked the know-how and expertise required to manufacture lids for use in K-Cup Brewers. As a result, its start-up costs were substantially higher than they would have been if TreeHouse had been able to purchase lids from an experienced lid manufacturer.[91]

191.    Upon information and belief, several filter suppliers allegedly declined to supply TreeHouse because they were already supplying Keurig with the same product. Thus, TreeHouse was forced to find a new supplier of filters and adapt TreeHouse's production process to use the new products. TreeHouse allegedly had to incur additional costs because TreeHouse had to work with the new supplier to improve the filter for use in Compatible Cups.[92]

192.    As demonstrated by TreeHouse's experience, these multi-year, exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of substantially foreclosing competitors from access to resources they need to compete with Keurig.

193.    These unduly restrictive agreements also negatively impacted TreeHouse's ability to effectively compete in the marketplace, which substantially reduced consumers' choice for Compatible Cups and increased the price of Competitor Cups as well as, by extension, allowing Keurig to continue charging supra-competitive prices for K-Cups.

194.    Moreover, these anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups. As parties to these agreements have admitted, Keurig does not restrict the ability to sell these same products for other purposes just so long as those products are not sold to a Keurig competitor who intends to use them to make Compatible Cups for use in K-Cup Brewers.

---

[91] *See id.* at ¶ 204.
[92] *See id.* at ¶ 206.

    **C. Keurig Sold Its K-Cup Brewers At or Below Cost to Consumers and Provided K-Cup Brewers to Businesses For Free As Long As Businesses Agreed to Purchase K-Cups Exclusively from Keurig**

195.    Keurig's business model depends upon its ability to leverage its Single-Serve Brewer monopoly to restrain competition and extract monopoly profits from the K-Cups it sells in the Compatible Cup Market. Specifically, this business model relies on Keurig's ability to: (i) drive sales of Keurig's highly profitable K-Cups by excluding competition for sales of Single-Serve Brewers; (ii) restrain price competition for Compatible Cups; and (iii) maintain supra-competitive K-Cup prices for extended periods of time.

196.    As it admits in its own statements to the public and investors, Keurig sells K-Cup Brewers at or below cost[93] to saturate the market with brewers that are only compatible with the K-Cup format, thereby locking consumers into using the K-Cup format instead of other types of Portion Packs.

197.    K-Cups account for the bulk of Keurig's profit margin, and Keurig's earnings come primarily from its direct or licensed sales of K-Cups, not from its sales of Single-Serve Brewers.

198.    While Keurig sacrifices its brewer profits to drive K-Cup sales, it recoups and exceeds its losses on brewer sales by charging supra-competitive prices resulting in a 50% margin on K-Cups.

199.    The chart below demonstrates how Keurig has dramatically increased its gross profits over the time period of 2009–2014, mainly through Portion Pack sales, the majority of which are sales of K-Cups.

---

[93] GMCR 2015 10-K at p. 2.



Data Source: www.trefis.com

### V.  Keurig Purposefully Disseminated False, Misleading, and Disparaging Statements About Competitors' Compatible Cups

200.    At various times throughout the relevant period, Keurig has made false, misleading, and disparaging statements with respect to Competitor Cups (collectively, the "Misrepresentations and Disparagements").

201.    The Misrepresentations and Disparagements are part of Keurig's broader campaign of anticompetitive conduct and its strategy to unlawfully maintain its monopoly and eliminate competition in the Compatible Cup Market. In making these Misrepresentations and

Disparagements, Keurig's intention was and continues to be to mislead customers with false information and discourage them from purchasing Competitor Cups.

202.    Throughout the relevant period, Keurig has misrepresented to current and prospective purchasers of Competitor Cups that the quality of Competitor Cups is inferior to Keurig's K-Cups. Examples of such Misrepresentations and Disparagements include, but are not limited to, misrepresentations that Competitor Cups:

203.    will decrease the performance of Keurig Brewers;

204.    will decrease the overall life of Keurig Brewers;

205.    will cause damage to Keurig Brewers; and

206.    will void Keurig Brewers' One Year Limited Warranty.[94]

207.    Keurig has told Rogers' customers that Rogers' OneCup Competitor Cup should not be used with Keurig Brewers because they will "gum up" the machine and the customer's warranty on the Keurig Brewer may be voided as a result of such use.[95]

208.    In a previously filed Direct Purchaser class action, Rogers' CFO, Michael L. Sarina, testified that one effect of Keurig's Misrepresentations and Disparagements involved foreclosing Rogers from entering into agreements with certain retailers to supply private label products.[96]

209.    Additionally, in the prior-filed Direct Purchaser class action, Rogers' CFO Sarina testified that Keurig has made and continues to make these Misrepresentations and Disparagements to consumers who call Keurig's customer support telephone line.[97]

210.    Purchasers of Competitor Cups have reported Keurig's Misrepresentations and Disparagements to competitor customer support lines.

---

[94] *See* Guidelines for Inquiries and Requests for Information, KGM00000089-104 at KGM00000095 ("Guidelines").
[95] Rogers Decl. at ¶ 29.
[96] 1:14-md-02542-VSB-HBP, D.E. 237 (Amended Complaint), ¶ 201.
[97] *Id.*, ¶ 202.

211.   On information and belief, complaints from Rogers' customers demonstrate the

Misrepresentations and Disparagements made by Keurig:

a. On December 19, 2013, one customer wrote to Rogers Gourmet Coffee & Tea Market: "Hello, I just wanted to tell you that my Keurig Coffee pot has stopped making coffee. One of the reasons, so they told me was that you[r] coffee doesn't have their seal of approval on it. Even thou[gh] your coffee stated that we can use it. They told me I shouldn't us[e] it... I love your coffee! Please get approved. My coffee pot is only 6 months old and they wont replace it if I continue to use your cups!!!! Thank you, Lisa."[98]

b. Similarly, on January 10, 2013, another customer wrote to Rogers Gourmet Coffee & Tea Market: "I recently purchased San Franciso [sic] bay French Roast coffee K Cup PODS. On the Box you mention Keurig, Breville, Mr. Coffee etc. I called Keurig and they said NOT to use this POD in the Keurig because it is NOT approved by Keurig and can mess up your Keurig coffee maker."[99]

c. On June 16, 2014, a couple wrote to Rogers Gourmet Coffee & Tea Market: "Our Keurig 75 stopped making full cups of coffee. When we contacted them they blamed the coffee pods we have been using. We purchased three boxes of 160 pods each of your coffee and enjoy it immensely. They specifically stated it was not approved for their product. We are 75 years old and feel this does not make sense to us but feel you should be notified of their response. Any help is greatly appreciated. Sincerely, Joe [[]]."[100]

d. On June 5, 2014, a customer wrote to Rogers Gourmet Coffee & Tea Market: "Sorry, I am so slow in getting back with you. Approximately 2 weeks ago, when our Keurig coffee maker, which was about 4 months old, stopped working, we called the help line at Keurig to troubleshoot the problem. The customer service lady asked us what pods we were using we replied San Francisco Bay pods. She stated that using this brand voided our warranty with Keurig. We wanted you to know that Keurig is telling people this. We like your brand of coffee and hope that this problem can be resolved..."[101]

212.   Online customer reviews for Competitor Cups paint similar pictures. In reviewing

Rogers brand San Francisco Bay Coffee OneCups, an Amazon.com reviewer wrote: "When I called

Keurig for assistance I was informed that this coffee was not a licensed manufacturer of 'K' cups

---

[98] 1:14-md-02542-VSB-HBP, D.E. 237, ¶ 205 (citing Declaration of Warren Yamauchi in Support of Plaintiffs' Motion for a Preliminary Injunction (ECF No. 98) ("Yamauchi Decl."), at Exhibit 1 (ECF No. 98-1)).
[99] *Id.* (citing Exhibit 2 (ECF No. 98-2)).
[100] *Id.* (citing Exhibit 3 (ECF No. 98-3)).
[101] *Id.* (citing Exhibit 4 (ECF No. 98-4)).

and that by using them I would in essence void the warranty on the machine. They did replace the machine but told me that using non-licensed coffee cups would result in voiding the warranty."[102] Another reviewer wrote, "Not only can they not guaranty the unauthorized K-Cups, they can also void your warranty."[103]

213.    Online customer reviews for Treehouse brand Grove Square Cappuccino Single Serve Cups noted similar sentiments. One Amazon.com reviewer wrote, "First of all, tasted pretty good. BUT, contacted a few Keurig-Cup authorized online sellers and was told by all that Grove Square are NOT approved by Keurig and using them will void the warranty on your brewer. Was told they are a 'pirated' product."[104] Another reviewer wrote, "Void your warranty???? This warning should be at the top of the reviewer comments!!!! I never would have ordered it if I had known it would void my warranty & clog my coffee maker!!!"[105]

214.    Keurig made and promoted these Misrepresentations and Disparagements without any proper factual foundation. On information and belief, at the time of making these statements, Keurig had not tested any other brands to determine whether Competitor Cups decrease the performance or overall life of a Keurig Brewer, or cause damage to a Keurig Brewer.[106]

215.    On the other hand, as of the filing of the Direct Purchasers Class Action Amended Complaint, Competitor Cup manufacturer Rogers had conducted between 15,000 and 20,000 tests of Rogers' OneCup product in Keurig Brewers and did not discover a single instance in which the OneCup product caused damage to the Keurig Brewer or caused it to malfunction.[107]

---

[102] Customer review, Amazon.com, San Francisco Bay Coffee, Breakfast Blend, 80 OneCup Single Serve Cups, http://www.amazon.com/review/RHR7BKT16FM6A/.
[103] Id., http://www.amazon.com/review/R20Z2IUX9XADUX/.
[104] Customer review, Amazon.com, Grove Square Cappuccino Variety Pack, 72-Count Single Serve Cup for Keurig K-Cup Brewers, http://www.amazon.com/review/R155AT1NBWJ62/.
[105] Id., http://www.amazon.com/review/RGTQCLGRIDTHM.
[106] See Guidelines; FAQ from Keurig's website noting "we do not make or test the other brands."
[107] 1:14-md-02542-VSB-HBP, D.E. 237, ¶ 210 (citing Rogers Decl. at ¶ 30).

216.    Moreover, overwhelmingly favorable reviews of Competitor Cups have shown that customers consider these products to be of high quality.[108]

217.    Keurig continues to make the Misrepresentation and Disparagement that using a Keurig owned and licensed brand pod will result in "the best beverage experience."[109]

218.    Keurig has also made the Misrepresentations and Disparagement in relation to Keurig's K-Select™ Brewer, stating that "All Keurig® Classic Series models, including our K-Select™ brewer, only brew K-Cup® pods."[110]

219.    The current Limited One Year Warranty on Keurig Brewers vaguely states that "Only the use of Keurig® K-Cup® brand pods and accessories will guarantee the proper functioning and lifetime of your Keurig® brewer. Any damage to or malfunction of your brewer resulting from the use of non-Keurig® pods and accessories may not be covered by this warranty or may result in a service fee if the damage or malfunction is determined to be caused by such use."[111]

220.    In 2015 the Limited One-Year Warranty included with existing Keurig Brewers did not explicitly indicate that the use of Competitor Cups would void the warranty or cause warranty issues.[112] Rather, Keurig stated, "Nor does this warranty cover damages caused by services performed by anyone other than Keurig or its authorized service providers, use of parts other then [sic] genuine Keurig parts, or external causes such as abuse, misuse, including use in an office setting or other commercial setting, inappropriate power supply or acts of God."

---

[108] *Id.* ¶ 212 (citing Yamauchi Dec. at ¶ 13).

[109] "Am I limited to only brewing Keurig® brand pods in your K-Select™ brewer?", Keurig Support (Sept. 15, 2017), http://support.keurig.com/article?id=kA036000000SpkJ

[110] "What type of pods can I use in the K-Select™ brewer?", Keurig Support (Sept. 22, 2017), http://support.keurig.com/article?id=kA036000000SpkQ&retURL=

[111] "Brewer Warranty Information", Keurig Support (June 22, 2020), http://support.keurig.com/article?id=kA036000000CJGOCA4

[112] *See* 1:14-md-02542-VSB-HBP, D.E. 237, ¶ 213 (citing Brewer Support, Keurig.com, http://www.keurig.com/support/k-cup-brewers#).

221.    Keurig made this vague statement regarding the limitations of its one-year warranty in violation of the Magnuson-Moss Warranty Act (the "Act"), which strictly prohibits "tie-in" sales provisions.[113]

222.    Tie-in sales provisions link a warranty to the use of other branded products sold by the same manufacturer. The one exception to the tie-in sales provision of the Act is for those who can demonstrate to the Federal Trade Commission that the warranted product will not work properly without a specified item or service.

223.    Thus, Keurig further leverages its monopoly power in the Single-Serve Brewer Market by conditioning its brewer warranty on the purchase of its authorized Portion Packs in violation of the Act.

224.    Keurig's Misrepresentations and Disparagements in violation of the Act have the effect of coercing its brewer customers into buying K-Cups, or other Keurig licensed cups, rather than competing with Competitor Cups on the basis of quality and price.

225.    In disseminating these Misrepresentations and Disparagements, Keurig's purpose was and continues to be to mislead consumers with false information and discourage them from purchasing and/or dealing in Competitor Cups.

226.    Thus, Defendant's use of Misrepresentations and Disparagements is another unlawful method by which Plaintiff is deprived of the choice of purchasing high-quality, less-expensive, and environmentally friendly Competitor Cups and forced to pay supra-competitive prices for K-Cups.

---

[113] Magnuson-Moss Warrant Act, 15 U.S.C. § 2301 (1975).

## VI.   Keurig's Specifically Designed Its 2.0 K-Cup Brewer with Lock-OutTechnology to Block Competition from Compatible Cups

227.    With its 2.0 K-Cup Brewer, Keurig sought to impose an exclusionary technological barrier to prevent consumers and commercial customers of K-Cup Brewers from using Competitor Cups and to coerce retailers into replacing low-priced Competitor Cups with K-Cups.

228.    In September 2014, Keurig launched its 2.0 K-Cup Brewers with "interactive technology" which Keurig alleges will instruct the brewers on the "recipes" to use (i.e., set temperatures, brewing size, water pressure and other categories) to "ensure the system delivers on the promise of excellent quality beverages, produced simply and consistently every brew."[114]

229.    The so-called "breakthrough innovation" was in fact old. For example, Bosch had for some time been selling its Tassimo brewer with "Intellibrew[TM]" barcode technology that is advertised as allowing the bar code on each T-disc to tell the brewer the exact temperature, cup size, and brewing time in order to purportedly make the "perfect cup."

230.    Based upon expert analysis, it appears that there may not be interactive technology on the 2.0 K-Cup lids at all.[115] The only information on the 2.0 K-Cup lids that the lock-out technology is designed to identify is whether the K-Cup is a Keurig product. There is no imprint or ring containing "interactive technology" conveying "recipe" information:

> The ink on the K-Cup lid is static and does not change when "read." Moreover, none of the 2.0 K-Cups I examined varied in terms of the fluorescent ink marking used. As such, it is my opinion that it is unlikely that the florescent ring on the 2.0 cups will be used on the Keurig 2.0 K-Cup Brewer to change brew settings (e.g., temperature, size or pressure) based on the K-Cup inserted.[116]

231.    Simply put, the florescent ring on the 2.0 K-Cups was not intended to, nor does it actually enhance the beverage making process. Instead, it is part of Keurig's attempt to prevent

---

[114] *See* "Keurig 2.0 machines to feature RFID-limited K-cups", Consumer Affairs (Mar. 3, 2014), https://www.consumeraffairs.com/news/keurig-20-machines-to-feature-rfid-limited-k-cups-030314.html
[115] *See* 1:14-md-02542-VSB-HBP, (D.E. 12-1), Declaration of Larry F. Stewart dated June 16, 2014, at ¶¶ 21-33.
[116] *Id.* at ¶ 33.

Competitor Cups from being used in the Keurig 2.0 K-Cup Brewer, prevent competitors from being able to compete in the Compatible Cup Market, and to continue to extract monopoly profits from the Compatible Cup Market.

232.   Keurig's announced new technology threatened to eliminate competitive access to 2.0 K-Cup Brewers as well as consumer and retail customer choice by technologically tying the purchase of K-Cups to the purchase of K-Cup Brewers for the anticompetitive purpose of locking out Compatible Cups. By tying 2.0 K-Cup purchases to 2.0 K-Cup Brewer purchases, Keurig intended to leverage its monopoly over the Single-Serve Brewer Market to exclude competition in the Compatible Cup Market.

233.   Even if Keurig was able to articulate a consumer benefit for its lock-out strategy, any such purported benefit would not, in any event, outweigh its anticompetitive effects. Consumers generally prefer having the ability to choose from a greater variety of Compatible Cups.

234.   As industry news editor Keith Nunes explained, in fact "Keurig 2.0 is the company's answer" to the question of "how would it protect its market share."[117]

235.   And, as one financial analyst observed, "the introduction of a new closed system, dubbed Keurig 2.0, which will only use licensed K-Cups . . . will effectively hold consumers, who can currently shop for the lowest-priced (albeit likely unlicensed K-Cup) hostage to higher prices. With the new machines, Keurig is effectively cutting off competition. I know, I know, a monopoly is good, but marketplace/consumer confusion isn't."[118]

---

[117] Keith Nunes, GMCR playing hardball with Keurig 2.0, FOOD BUSINESS NEWS (Nov. 21, 2013), http://www.foodbusinessnews.net/articles/news_home/Business_News/2013/11/GMCR_playing_hardball_with_Keu.aspx?ID=%7B58DC5419-F51B-486C-8328-64CD811AFC81%7D&cck=1.
[118] Herb Greenberg, *Cramer vs. Greenberg: The Battle of Keurig*, THE STREET (Nov. 21, 2013), http://www.thestreet.com/story/12119516/1/cramer-vs-greenberg-the-battle-of-green-mountain html.

236.    Accordingly, Keurig's President and CEO in 2013 "expect[ed] [the] unlicensed [competitor Compatible Cup] share of the system to . . . begin to decline in the second half [of fiscal 2014] and thereafter," as prior generations of K-Cup Brewers are replaced, corresponding roughly with the introduction of the 2.0 K-Cup Brewer.[119]

237.    Prior to the launch of the 2.0 K-Cup Brewer, Keurig began a campaign to mislead or coerce Compatible Cup makers to enter into exclusive licensing agreements with Keurig by enlisting the help of their retail customers. Specifically, upon information and belief, Keurig contacted retailers to inform them that the Compatible Cups they have been purchasing from Keurig competitors will not work in 2.0 K-Cup Brewers. Keurig encouraged those retailers to pressure their suppliers into becoming "authorized" or "licensed" partners.

238.    Keurig's anticompetitive business practices caused retailers to express concern to at least one maker of non-licensed Competitor Cups. Specifically, upon information and belief, retailers told Rogers in the 2014–2015 time frame that they would delay purchasing decisions until they can confirm whether the Keurig 2.0 K-Cup Brewers will be compatible with Competitor Cups. The following well-known and large retailers have expressed concern about purchasing Competitor Cups and, therefore, delayed purchasing Competitor Cups: ADM Vending, A&P, Associated Services, Bed Bath & Beyond, Big Y, Bozzutos, Coffee Pause, Costco, Delhaize, Diamond Rock Spring, Evans Coffee, Fairway, Garber Broz, Kroger, Ingles, Northeast Coffee Distributing Corp., One Cup Coffee, Price Rite, Quill, Shoprite, Staples, U.S. Coffee, and Wakefern.

---

[119] Brian Kelley, Keurig Q4 2013 Earnings Call Transcript, (Nov. 20, 2013), https://seekingalpha.com/article/1853341-green-mountain-coffee-roasters-ceo-discusses-f4q-2013-results-earnings-call-transcript.

239.    These retailers' hesitancy to purchase and stock Competitor Cups indicates that Plaintiff was deprived of the choice of purchasing high-quality, less-expensive, and environmentally friendly Competitor Cups and was, instead, forced to pay supra-competitive prices for K-Cups.

## THE ANTICOMPETITIVE EFFECTS OF KEURIG'S UNLAWFUL MONOPOLIZATION OF THE RELEVANT MARKETS

240.    Keurig's above-described anticompetitive acts had serious anticompetitive effects on competition in the Single-Serve Brewer and Compatible Cup Markets overall and resulted in BJ's paying supra-competitive prices for K-Cups.

241.    With little to no competition, depending on the line of business, Keurig has been able to charge supra-competitive prices for K-Cups. As a result, BJ's has been forced to pay at least 10% to 15% more for Keurig-owned and licensed K-Cups than it would have in the absence of Keurig's unlawful anticompetitive conduct.

242.    At least twice during the relevant period, Keurig raised K-Cup prices approximately 12%. While Keurig claimed such price increases were caused by rising input costs, industry sources state that commodity input prices are insignificant to K-Cup pricing. As one Compatible Cup manufacturer stated, "[o]nly a small amount of coffee is in each cup. The price of the coffee is an insignificant factor in the cost of our production."[120] A sales executive for a global private-label food manufacturer also explained that "single-cup products are relatively shielded from even a sudden upturn in raw coffee pricing."[121] Similarly, a marketing director for a private-label coffee producer said "[c]ommodity costs are pretty irrelevant on the single-cup buyer side. This is not a product type that goes up when coffee costs rise and down when they fall."[122] Indeed, upon information and belief,

---

[120] Reverdy Johnson, *Private-Label Threat Brewing for Green Mountain's K-Cups*, BLUESHIFT REPORT (July 3, 2013), http://blueshiftideas.com/reports/071302PrivateLabelThreatBrewingforGreenMountainsKCups.pdf.
[121] *Id.*
[122] *Id.*

Keurig's CEO has admitted that its K-Cups are "insulated from rising coffee commodity costs due to a built-in price premium" and, as a result, "single-cup pricing has continued to premiumize the category regardless of what the commodity prices of coffee have done."

243.    Keurig's anticompetitive conduct has also limited the number and variety of competitive Compatible Cup beverages available to BJ's. By foreclosing access to markets, inputs, suppliers, distributors, and brands, Keurig has limited the output, distribution, and availability of Competitor Cups. As a result, consumers and commercial customers like BJ's been impeded or entirely prevented from accessing the types and flavors of beverages offered by competitor Compatible Cup makers.

244.    Restricted access to competitors' Compatible Cups has been especially harmful to consumers who prefer the taste, flavor, and/or quality of such cups over Keurig-owned or licensed K-Cups. Keurig's restriction of this access has prevented BJ's from purchasing Compatible Cups and providing those cups to consumers, which would expand BJ's business.

245.    Consumer choice has been further limited because competitors disadvantaged by Keurig's anticompetitive acts have suffered a diminished capacity to invest in research and resources needed to develop new products and to improve the quality of their existing Compatible Cups.

246.    Moreover, the introduction of Keurig's 2.0 K-Cup Brewer threatened to further harm competition and consumers in the future. Keurig already controlled approximately 95% of the Compatible Cup Market and attempted to substantially foreclose competitor Compatible Cup makers from the balance of the market by locking Competitor Cups out of the market for new brewers and the replacement of prior generations of K-Cup Brewers.

247.    In fact, as described above, Keurig's 2.0 K-Cup Brewer launch immediately harmed competition. For example, upon information and belief Keurig launched the 2.0 K-Cup Brewer to

induce retailers and distributors to cease doing business with Competitor Cup manufacturers and sellers.

248.    The unlawful elimination of Compatible Cup competition harmed and will continue to harm consumers like Plaintiff by maintaining or raising K-Cup prices at supra-competitive levels and by eliminating consumer choice.

## CAUSES OF ACTION

### COUNT ONE
### Monopolization
### (Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

249.    Plaintiff hereby incorporates each preceding and succeeding paragraph as if fully set forth herein.

250.    Keurig, as alleged herein, has and had monopoly power in the Single-Serve Brewer and Compatible Cup Markets, including the power to control prices and exclude competition.

251.    Keurig has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in these markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

252.    Keurig has unreasonably restrained, and further threatens to unreasonably restrain competition in the Single-Serve Brewer and Compatible Cup Markets by:

- coercing manufacturers of the machinery and components necessary to make Compatible Cups to enter into anticompetitive agreements that restrain market entry, exclude competitors, limit output, and raise competitors' costs;

- agreeing with competitor roasters and coffee brands to enter into anticompetitive agreements to exclude competitors, allocate markets, and/or limit output;

- coercing distributors and retailers to enter into long-term, exclusive anticompetitive agreements that restrain market entry, exclude competitors, and/or limit output;

- aggressively eliminating potential competitors through successive anticompetitive acquisitions;

- filing objectively and subjectively baseless ("sham") litigation against competitors for the purpose of interfering with their ability to compete in the Compatible Cup Market;

- misusing its brewer patents by attempting to impermissibly broaden their scope to cover Competitor Cups, and by conditioning consumers' use of the patented K-Cup Brewers on the use of its unpatented K-Cups and engaging in an unlawful tying arrangement;

- announcing an anticipated tie of the purchase of K-Cups to the purchase of 2.0 K-Cup Brewers in order to unreasonably restrain competition from Competitor Cup makers;

- raising rivals' costs above those that would exist under competitive conditions by coercing Competitor Cup makers to enter purported "licenses" that restrict output and require the payment of improper "royalty" payments; and

- making material misrepresentations and omissions to retailers, distributors, and end customers, including but not limited to, misrepresentations and omissions regarding the compatibility, performance, safety, and quality of Competitor Cups as compared to K-Cups in order to perpetuate its Compatible Cup Market (or in the alternative, Portion Pack Market) monopolies by deterring customers from doing business with Competitor Cup makers and thereby also dissuading other potential competitors from

entering the market. As set forth in great detail above, Keurig's misrepresentations were (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of neutralization or other offset by Compatible Cup makers.

253.    While many of these anticompetitive acts themselves constitute individual antitrust violations on a stand-alone basis, together they support a broader monopolization claim.

254.    As a direct and proximate result of Keurig's anticompetitive and monopolistic conduct, Plaintiff has been damaged by, among other things: (i) Keurig's ability to charge supra-competitive prices for K-Cups; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

## COUNT TWO
### Exclusive Dealing
### (Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14)

255.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

256.    As detailed above, Keurig has monopoly power in the Single-Serve Brewer and Compatible Cup Markets, including the power to control prices and exclude competition. Keurig has willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with machine suppliers, component suppliers, competitor roasters, competitor coffee brands, and retailers, creating high barriers to entry and unreasonably excluding competitors in the Single-Serve Brewer and Compatible Cup Markets.

257.    These exclusive dealing agreements are unreasonably restrictive in terms of breadth, duration, and market coverage.

258. This web of exclusive dealing agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups, because Keurig does not restrict the ability to sell the same products for purposes other than for use in K-Cup Brewers. Thus, Keurig's exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Keurig.

259. This conduct substantially foreclosed competition in the Compatible Cup Market.

260. Because this conduct involves exclusionary agreements between two or more unaffiliated entities, this conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1. These exclusionary agreements also violate Section 2 of the Sherman Act, 15 U.S.C. § 2, because these agreements constitute anticompetitive acts intended to maintain Keurig's monopoly in the Compatible Cup Market.

261. As a direct and proximate result of Keurig's anticompetitive and monopolistic conduct, Plaintiff has been damaged by, among other things: (i) Keurig's ability to charge supra-competitive prices for K-Cups; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

**COUNT THREE**
**Monopoly Leveraging**
**(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)**

262. Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

263. As detailed above, Keurig has monopoly power in the Single-Serve Brewer Market, including the power to control prices and exclude competition.

264.    Keurig has willfully and intentionally used its monopoly power in the Single-Serve Brewer Market to gain or attempt to gain or maintain monopoly power in the Compatible Cup Market, specifically, by selling K-Cup Brewers at or below cost to lock consumers into the K-Cup format, then coercing companies, whose business depends on access to K-Cup Brewers, to sign anticompetitive agreements prohibiting them from dealing with Keurig's competitors in the Compatible Cup Market.

265.    Keurig further continued to leverage its monopoly power in the Single-Serve Brewer Market to gain or attempt to gain or maintain monopoly power in the Compatible Cup Market by tying 2.0 K-Cup purchases to purchases of its 2.0 K-Cup Brewers, which purportedly contain "interactive technology" which locks out the use of Competitor Cups that cannot be justified on the basis of any legitimate consumer benefit.

266.    Keurig willfully has acquired or maintained monopoly power by the exclusionary conduct detailed above, rather than through legitimate business acumen, skill, efficiency or legitimate innovation.

267.    As a direct and proximate result of Keurig's anticompetitive and monopolistic conduct, Plaintiff has been damaged by, among other things: (i) Keurig's ability to charge supra-competitive prices for K-Cups; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

**COUNT FOUR**
**Attempted Monopolization in the Alternative**
**(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)**

268.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

269.    As detailed above, Keurig has monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the Single-Serve Brewer and Compatible Cup Markets, including the power to control prices and exclude competition.

270.    Keurig has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Single-Serve Brewer and Compatible Cup Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

271.    Keurig's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Single-Serve Brewer and Compatible Cup Markets. Keurig's ongoing anticompetitive conduct presents a dangerous probability that Keurig will succeed, to the extent it has not already, in its attempt to monopolize the Single-Serve Brewer and Compatible Cup Markets.

272.    As a direct and proximate result of Keurig's anticompetitive and monopolistic conduct, Plaintiff has been damaged by, among other things: (i) Keurig's ability to charge supra-competitive prices for K-Cups; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

**COUNT FIVE**
**Declaratory and Injunctive Relief**
**(Under Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2)**

273.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

274.    Plaintiff seeks declaratory and injunctive relief under the federal antitrust laws.

275.    Plaintiff's allegations described herein constitute violations of §§ 1 and 2 of the Sherman Act.

276.    Keurig effectuated a scheme to restrain trade and monopolize a market.

68

277.    There is and was no legitimate, non-pretextual procompetitive business justification for Keurig's conduct that outweighs its harmful effect.

278.    As a direct and proximate result of Keurig's anticompetitive scheme, as alleged herein, Plaintiff was harmed as aforesaid.

279.    The goal, purpose, and/or effect of the scheme was to prevent and/or delay competition to continue charging supra-competitive prices for K-Cups without a substantial loss of sales.

280.    The Keurig anticompetitive agreements alleged herein should be declared invalid and unenforceable.

281.    Plaintiff has been injured to its business or property by reason of Keurig's antitrust violations alleged in this Complaint. Its injury consists of paying higher prices for K-Cups than it would have paid in the absence of these violations. These injuries will continue unless halted.

282.    Plaintiff, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a) hereby seeks a declaratory judgment that Keurig's conduct constitutes a violation of §§ 1 and 2 of the Sherman Act.

283.    Plaintiff further seeks equitable and injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Keurig's unlawful conduct.

**COUNT SIX**
**Unfair Competition**
**(Violation of Chapter 93A of the Massachusetts General Law, Mass. G.L.c. 93A)**

284.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

285.    Keurig's acts and practices detailed above violate Massachusetts' consumer protection laws, Mass. Gen. Laws ch. 93A, § 1, *et seq.*, which prohibit, inter alia, unfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, *id.* §

2.

286.    Keurig's conduct and practices have substantial anticompetitive effects in

Massachusetts, including increased prices and costs.

287.    Plaintiff was harmed by Keurig's anticompetitive conduct in a manner that the

Massachusetts consumer protection laws were intended to prevent when it paid more for K-Cups

than it would have paid in a competitive market.  Plaintiff has suffered and continues to suffer

damages as a result of Keurig's conduct.

## **PRAYER FOR RELIEF**

288.    WHEREFORE, Plaintiff demands a trial by jury and respectfully requests:

    a.  Pursuant to 28 U.S.C. § 2201, a declaration that Keurig has monopolized, or in the alternative, attempted to monopolize, the Compatible Cup Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

    b.  Pursuant to 28 U.S.C. § 2201, a declaration that Keurig's exclusive dealing agreements are unreasonable and unenforceable restraints of trade that violation Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14;

    c.  Pursuant to 28 U.S.C. § 2201, a declaration that Keurig has unlawfully misused its patents, filed sham litigation and used its monopoly power in the Single-Serve Brewer Market to monopolize the Compatible Cup market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

    d.  Pursuant to 15 U.S.C. § 15, compensatory and trebled damages resulting from Keurig's violations of the Sherman Act;

    e.  Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Keurig from continuing the unlawful acts in violation the Sherman Act;

    f.  Pursuant to 28 U.S.C. § 2202, such further relief as may be necessary of proper based upon this Court's declaratory judgments;

    g.  Pursuant to Mass. Gen. Laws ch. 93A, § 1, *et seq.*, compensatory and trebled damages resulting from Keurig's violations of the Massachusetts Consumer protection laws;

    h.   Plaintiff's costs, expenses, and reasonable attorneys' fees in bringing this action; and

    i.   Such other relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury in this action of all issues so triable.

Respectfully submitted,

Dated: July 30, 2021

*/s/ Philip J. Iovieno*

Philip J. Iovieno
Nicholas A. Gravante, Jr.
Karen C. Dyer
Jack G. Stern
Gillian Groarke Burns
Mark A. Singer
Elizabeth R. Moore
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
Tel:  (212) 504-6000
Fax:  (212) 504-6666
E-mail: philip.iovieno@cwt.com
        nicholas.gravante@cwt.com
        karen.dyer@cwt.com
        jack.stern@cwt.com
        gillian.burns@cwt.com
        mark.singer@cwt.com
        elizabeth.moore@cwt.com